Dr. Ben S. BRANCH, as Trustee of Bank of New England Corporation, and derivatively on behalf and in the name of Connecticut Bank and Trust Company, N.A. and Maine National Bank, Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate capacity, Federal Deposit Insurance Corporation, in its capacity as receiver for Bank of New England, N.A., Connecticut Bank & Trust Company, N.A., Maine National Bank, Federal Deposit Insurance Corporation, in its capacity as receiver for New Bank of New England, N.A., New Connecticut Bank & Trust Company, N.A., and New Maine National Bank, and Fleet Bank of Massachusetts, N.A., Fleet Bank, N.A., and Fleet Bank of Maine, Defendants.

Civ. A. Nos. 91–10976–Y, 92–10091–Y, 92–10807–Y, 92–10904–Y and 92–12091–Y.

United States District Court,
D. Massachusetts.

June 22, 1993.

386

Richard Hiersteiner, Palmer & Dodge, Boston, MA, for plaintiff John L. Whitlock, Trustee of Bank of New England Corp.

Hugh M. Ray, Andrews & Kurth, Dallas, TX, Van Oliver, Andrews & Kurth, Houston, TX, for plaintiff Ben Branch.

Jon D. Schneider, Goodwin, Proctor & Hoar, Boston, MA, for defendant New Bank of New England, N.A.

Jon D. Schneider, Goodwin, Proctor & Hoar, Deborah S. Griffin, Peabody & Arnold, Boston, MA, for defendants New Connecticut Bank & Trust Co., N.A., New Maine Nat. Bank.

Deborah S. Griffin, Peabody & Arnold, Boston, MA, for defendant F.D.I.C., an agency of U.S., in its corporate capacity and as Receiver for Bank of New England, N.A., as Receiver for Connecticut Bank & Trust Co., N.A. and as Receiver for Maine Nat. Bank.

William W. Abendroth, Boston, MA, for consolidated defendant Fleet Bank–NH.

Deborah S. Griffin, Peabody & Arnold, Boston, MA, Thomas A. Schulz, Charles L. Cope, II, Wendy B. Kloner, Tom M. Reeves, Susan K. Bank, Steven Kaufman, F.D.I.C., Washington, DC, for consolidated defendant F.D.I.C.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

During the late 1980s, Bank of New England Corporation ("BNEC"), a bank holding company, owned numerous subsidiary corporations including three national banks: Bank of New England, N.A. ("BNE"), Connecticut Bank and Trust Company, N.A. ("CBT"), and

Maine National Bank ("MNB") (collectively, the "Subsidiary Banks"). In 1989, BNEC and its Subsidiary Banks came under increased federal regulation due to financial problems at BNE. During the next several years, and allegedly under direction of several federal regulatory agencies, many of BNEC's assets were transferred both downstream from BNEC to its Subsidiary Banks, and sidestream from CBT and MNB to BNE. On January 6, 1991, the Comptroller of the Currency declared all three Subsidiary Banks insolvent, and BNEC filed for Chapter 7 bankruptcy one day later. The Federal Deposit Insurance Corporation ("FDIC") was then appointed receiver for the Subsidiary Banks, and subsequently transferred the Subsidiary Banks' assets first to several bridge banks (the "Bridge Banks"), and then to several private banks (the "Fleet Banks" or "Fleet").

This is a consolidated action by Dr. Ben S. Branch ("Branch"),[1] Chapter 7 Trustee of BNEC, to recover from the FDIC in both its corporate and receivership capacities, as well as from the Fleet Banks, over $2 billion in assets allegedly wrongfully transferred to and among BNEC's Subsidiary Banks. The gravamen of Branch's Complaints is that federal banking regulators, rather than close BNE upon its actual insolvency in 1989, instead kept it open in order to facilitate the transfer of BNEC's assets to BNE for the purpose of reducing the FDIC's liability to BNE's depositors when, as was then inevitable, BNE ultimately failed. Branch seeks recovery of the transferred assets under the Bankruptcy Code, the National Bank Act, the Federal Reserve Act, and Massachusetts common law. The defendants move to dismiss these consolidated actions upon a battery of jurisdictional and substantive defenses which raise important issues in uncharted areas of federal banking law.

## I. REGULATORY FRAMEWORK

 These disputes arise within a complex regulatory framework and involve multiple federal regulatory agencies acting in several capacities. The Office of the Comptroller of the Currency ("OCC") is a Treasury Department agency responsible for chartering, examining, and regulating national banks. The Board of Governors of the Federal Reserve System ("FED") is a federal banking agency charged with regulatory and supervisory control over bank holding companies that are members of the federal reserve system. Under the Federal Deposit Insurance Act (FDIA), 12 U.S.C. §§ 1811–33e, the OCC and FED are empowered to issue Cease and Desist Orders against banks and bank holding companies, respectively, in order to halt or remedy "unsafe or unsound" banking practices. 12 U.S.C. § 1818(b)(1), (3). Banks and bank holding companies may appeal the issuance of Cease and Desist Orders pursuant to an administrative scheme established by the FDIA. 12 U.S.C. § 1818(b), (h).

 Under the National Bank Act (NBA), 12 U.S.C. §§ 21–216d, the OCC is empowered to place a national bank into receivership whenever it "shall become satisfied of the insolvency" of the bank. 12 U.S.C. § 191. Under the FDIA, the receiver appointed by the OCC for an insolvent national bank must be the FDIC. 12 U.S.C. § 1821(c). This puts the FDIC in the position of acting in two separate capacities with respect to the insolvent bank. First, the FDIC acts in its corporate capacity ("FDIC–Corporate"), as an insurer of up to $100,000 on each deposit at the failed bank. 12 U.S.C. §§ 1811, 1821(a), (f). Second, the FDIC acts in its receivership capacity ("FDIC–Receiver"), in which it is responsible for marshalling the insolvent bank's assets and distributing them to the bank's creditors and shareholders. 12 U.S.C. §§ 192, 194,

---

**1.** Branch originally filed actions in the Districts of Massachusetts, Connecticut, Maine, and the District of Columbia in order to comply with the jurisdictional requirements of 12 U.S.C. § 1821(d)(6). The Connecticut, Maine and District of Columbia cases were subsequently transferred to this District as C.A. Nos. 92–10904–Y (Connecticut Complaint), 92–10807–Y (Maine Complaint), and 92–12091–Y (District of Columbia Complaint), and were ultimately consolidated along with C.A. No. 92–10091–Y (Massachusetts Complaint) into this lead case, C.A. No. 91–10976. This lead case was originally commenced in the Bankruptcy Court for the District of Massachusetts. This court has withdrawn the reference to the Bankruptcy Court.

1821(d)(2)(H). The FDIC is often required to deal with itself in its separate capacities, such as lending or selling to itself.

█ In fulfilling its duty to pay depositors when a bank is declared insolvent, the FDIC has two primary alternatives: liquidation or sale of the failed bank's assets to a bridge bank pursuant to a purchase and assumption agreement. A liquidation involves closing the insolvent bank, selling its assets, paying depositors their insured amounts, and covering any shortfall from an insurance fund created from assessments paid by the insured banks. 12 U.S.C. § 1821(a). A liquidation may have substantial disadvantages: "[a]ccounts are frozen, checks are returned unpaid, and a significant disruption of the intricate financial machinery results." *Gunter v. Hutcheson*, 674 F.2d 862, 865 (11th Cir.1982), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). The probability that uninsured deposits or liabilities will be paid in any substantial part is slight, and the cost to the FDIC of simply covering insured funds is great. *Texas American Bancshares, Inc. (TAB) v. Clarke*, 954 F.2d 329, 333 (5th Cir.1992).

█ Purchase and assumption transactions, on the other hand, are often "a dramatically effective and cost-efficient way to protect depositors, the banking system, and the resources of the insurance fund." *Federal Deposit Ins. Corp. v. Bank of Boulder*, 865 F.2d 1134, 1136 (10th Cir.1988), *cert. denied*, 499 U.S. 904, 111 S.Ct. 1103, 113 L.Ed.2d 213 (1991). Instead of closing the failed institution, FDIC–Receiver sells most of the assets and liabilities of the failed bank to a bridge bank pursuant to a Purchase and Assumption Agreement.[2] The bridge bank then opens the next day with no interruption of banking services or loss to depositors. In situations in which the liabilities assumed by the bridge bank exceed the assets acquired, FDIC–Corporate is authorized under FDIA to pay the bridge bank the difference in a cash payment. This cash is obtained from the FDIC's insurance fund, and in exchange, FDIC–Corporate acquires the untransferred, unassumed assets of the failed bank. The bridge bank's charter terminates on the earliest of several events, including the assumption of substantially all of the deposits and other liabilities of the bridge bank by a third party bank. 12 U.S.C. § 1821(n)(10). *See generally TAB*, 954 F.2d at 333.

The scenario in this case runs the gamut of federal banking regulation, encompassing both pre-insolvency regulation by the OCC and FED, as well post-insolvency purchases and assumptions facilitated by the FDIC.

## II. FACTUAL ALLEGATIONS [3]

█ In the 1980s, BNEC was a bank holding company owning numerous subsidiary corporations including the federally insured banks BNE, CBT, and MNB. During an annual on-site review in 1986, the OCC first discovered that BNE, BNEC's largest bank subsidiary, possessed an overly concentrated portfolio of risky real estate loans—a problem compounded by poor management and faulty loan assessments. During the next several years, and despite repeated warnings by the OCC, these problems caused BNE's financial condition seriously to deteriorate. On July 17, 1989, the written results of the OCC's December 31, 1988 examination of BNE revealed that BNE's credit quality had declined significantly due to poor quality of loans and aggressive, uncontrolled growth of its loan portfolio. By the summer of 1989, BNE was already insolvent to the point that the value of BNEC's 100% stock ownership

---

**2.** A bridge bank is a chartered bank that exists for a limited time to effectuate these purchase and assumption transactions. *See* 12 U.S.C. § 1821(n). The bridge bank is authorized to assume deposits and purchase assets of the insured bank, and may receive operating funds or assistance from the FDIC. *Id.* § 1821(n)(1)(B), (5) & (7). The bridge bank's charter terminates on the earliest of the following events: the passage of two years after the bridge bank was formed; the merger of the bridge bank with another bank; the sale of the stock of the bridge bank to another entity; or the assumption of substantially all of the deposits and other liabilities of the bridge bank by another bank. *Id.* § 1821(n)(10); *see TAB*, 954 F.2d at 333 n. 5.

**3.** In deciding Defendants' motion to dismiss, the court accepts as true the allegations in Branch's Complaints, and draws all reasonable inferences in Branch's favor. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993).

in BNE was effectively zero, and thus there was no realistic expectation that BNEC would ever receive any return based on that ownership. This loss of value also rendered BNEC insolvent by the summer of 1989. In contrast, BNEC's other two national subsidiary banks, CBT and MNB, were still fully solvent at that time, and thus BNEC's 100% ownership of those banks was still of substantial value to BNEC and thus its creditors.

As a result of the long-standing and increasingly serious problems at BNE, the federal regulatory agencies—OCC, the FED, and the FDIC (collectively, the "Regulators")—had a continuous and concerted presence at BNE commencing in the fall of 1989. On August 10, 1989, the OCC entered a formal Agreement with BNE (the "OCC Agreement"), which required BNE to address the problems outlined in the July 17, 1989 report and to submit monthly status reports to the OCC. (Defs.' App.Ex. 4.A.) In response to the Regulators' concerns over BNEC's capital, BNEC completed a bond offering in September 1989 and thereafter transferred, without recompense, the bulk of the $250 million in proceeds to BNE, CBT and MNB.[4]

During the OCC's 1989 on-site review of BNE, the OCC found that poor and rapidly deteriorating asset quality was threatening the viability of BNE. On or about December 15, 1989, BNEC projected its 1989 loan losses to exceed one billion ($1,000,000,000) dollars, the largest quarterly loss ever recorded by a domestic bank holding company. This prompted an investigation by the Securities and Exchange Commission ("SEC"), which determined that these losses had in fact occurred earlier. The SEC then required BNEC to restate its third quarter 1989 financials, and BNEC entered into a consent decree to that effect.

At a BNEC Board of Directors meeting on December 22, 1989, the Regulators advised BNEC to begin selling significant portions of its assets to its Subsidiary Banks. Through this program of transfers, internally known as the "Asset Distribution Program," the Regulators sought to reduce the FDIC's overall costs in handling BNE's inevitable failure by increasing the Subsidiary Banks' asset base at the expense of BNEC and its creditors. The Regulators facilitated the program by causing BNEC to replace its existing senior management with management approved by the Regulators. After selection and approval, these new managers regularly consulted with the Regulators, and were required to obtain the Regulators' consent for any significant actions which affected BNEC and its Subsidiary Banks.

In late December 1989, BNEC's New York Counsel prepared a Chapter 11 bankruptcy petition for BNEC to file in the Bankruptcy Court for the District of Massachusetts in the event that the Regulators declared BNE insolvent. The Regulators did not declare BNE insolvent at that time, however, because to do so would have prevented the transfer of BNEC's assets to BNE and the other Subsidiary Banks.

Throughout 1990, the Regulators' involvement with BNEC and BNE was pervasive. In order to continue the Asset Disposition Program and to meet its liquidity needs, BNE began borrowing on January 2, 1990 from the discount window of the Federal Reserve Bank of Boston. During the six-month period in which BNE was engaged in discount window borrowings, such borrowings were in amounts up to $2,300,000,000. All of these loans were subsequently repaid. Without availing itself of the discount window, BNE would have been unable to meet depositor funds through the first six months of 1990. At a January 17, 1990 BNEC board meeting, Martin Lipton, partner of Wachtell, Lipton, Rosen & Katz, BNEC's legal counsel, stated that BNEC continued "to live day to day at the mercy of the regulators."

On February 26, 1990, the FED entered a Cease and Desist Order against BNEC (the "FED C & D Order"), reinforcing the Regulator's control over day-to-day operations at

---

4. Although not mentioned in Branch's Complaints, BNE and the FED entered into a formal Memorandum of Understanding (the "FED MOU") on November 27, 1989, which required BNEC to ensure that the capital needs of its subsidiary banks were met. (Defs.' App. Ex. 3.A.) As discussed at note 8 *infra*, the FED MOU is properly before this court.

BNEC and requiring sweeping changes in BNEC's management, including the appointment of a new Chief Executive Officer satisfactory to the Regulators. (Defs.' Ex. 3.B.) The same day, the OCC entered a similar Cease and Desist Order against BNE (the "OCC/BNE C & D Order"). (Defs.' App.Ex. 4.B.) Soon thereafter, on April 16, 1990 and May 4, 1990, the OCC entered the same orders against CBT and MNB (the "OCC/CBT C & D Order" and "OCC/MNB C & D Order"), (Defs.' App.Exs. 4.C, E), and on May 3, 1990 and May 11, 1990, the same orders were entered against BNE–Old Colony and BNE–West, two other BNEC subsidiary banks. (Defs.' App.Exs. 4.D, F.) Following the entry of these orders, the Regulators controlled virtually all of the sources of BNEC operating funds.

As the Asset Disposition Program continued throughout the spring and summer of 1990, the institutional holders of BNEC's long-term public debt actively negotiated with bank officials in the hopes of restructuring over $700,000,000 in BNEC bonds. As negotiations were ongoing, the Regulators openly acknowledged their understanding that BNEC's creditors could attack the asset transfers to BNE as fraudulent conveyances; on June 28, 1990, BNEC presented to the OCC a revised capitalization plan which, at the Regulators' request, specifically discussed (i) the circumstances under which BNEC's creditors could file a petition for involuntary bankruptcy of BNEC; and (ii) whether BNEC's transfers to BNE could be attacked as fraudulent conveyances and, if so, whether legal structures could be implemented to minimize or eliminate that risk. In December 1990, after some eight months of negotiation, BNEC and its public debtholders agreed to a tentative "debt for equity swap." The bondholders withheld final approval for this plan, however, until assurances could be obtained from the Regulators

that the Subsidiary Banks would not be seized for a specified period of time.

The Asset Disposition Program was completed on December 31, 1990, with the merger of BNE–Old Colony into BNE. All told, BNEC's Board of Directors, in conjunction with the Regulators, had transferred over $500,000,000 in assets from BNEC to the Subsidiary Banks while BNE was insolvent. These assets included proceeds from public debt offerings and general asset dispositions, mergers of subsidiary banks into BNE, proceeds from transfers of BNEC non-banking subsidiaries, and miscellaneous transfers such as tax refunds, prepaid expenses and use of trademarks. All of these transfers had been made with the express intent to reduce the FDIC's resolution costs at the expense of BNEC and its creditors.

On January 3, 1991, BNEC and BNE reported fourth quarter 1990 operating losses of approximately $450,000,000 to the Regulators. This information appeared in news reports the next day, which precipitated deposit runs on both BNE and CBT. For the first time since the Great Depression and the creation of the federal deposit insurance system, depositors literally lined up outside the offices of a major federally insured bank seeking to withdraw their funds.

With the runs on BNE and CBT underway on Friday, January 4, CBT and MNB sold $1,484,000,000 and $133,490,000 of federal funds, respectively, to BNE.[5] On Sunday, January 6, 1991, while BNEC's creditors were working over the weekend in a futile restructuring effort, the Regulators took the following carefully orchestrated actions:

(1) Issued an order declaring BNE insolvent and appointing the FDIC as receiver ("FDIC–BNE").

(2) Wrote off the federal funds loan from CBT to BNE as now valueless. This cre-

---

5. Federal Funds are excess funds on deposit at a Federal Reserve Bank after the daily clearing of checks, drafts, and other monetary instruments. At the end of a given day, a bank may have a positive or a negative account balance at a Federal Reserve Bank. Since the Federal Reserve Banks' books must balance on a daily basis, banks with negative balances will commonly borrow (or "buy") Federal Funds from banks with positive balances. These Fed Funds loans (or "sales") are then repaid the following day, although in some circumstances they may be extended for a fixed term. G. Munn, et al., *Encyclopedia of Banking & Finance* at 343–44 (9th ed. 1991).

ated an equity capital deficiency of $49,-000,000 at CBT, and allowed the OCC to declare CBT insolvent and appoint the FDIC as receiver ("FDIC–CBT").

(3) Likewise, wrote off the federal funds loan from MNB to BNE as now valueless. Since MNB remained solvent even after this write off, the FDIC demanded payment by MNB of $1,000,000,000 (the FDIC's then estimated loss as receiver for BNE) under its cross-guarantee authority. Since MNB was without funds to meet the billion dollar demand, the Regulators closed MNB and appointed FDIC as receiver ("FDIC–MNB," and along with FDIC–CBT and FDIC–BNE, "FDIC–Receiver I").

(4) Organized "New BNE," "New CBT" and "New MNB" (the Bridge Banks) as national banking associations to continue the respective banking operations of their predecessors pending sale to a third party.

(5) Transferred to the Bridge Banks through purchases and assumptions virtually all of the assets and liabilities of BNE, CBT, and MNB, except those banks' liabilities to BNEC and its subsidiaries.

(6) Directed BNEC's Board of Directors to authorize the filing of a voluntary petition in bankruptcy by BNEC.

BNEC filed its Chapter 7 bankruptcy petition the next day, on January 7, 1991. On that same day, the Bridge Banks hired substantially all of the employees of BNEC and its bank subsidiaries. Soon thereafter, the Bridge Banks refused to turn over BNEC's deposit accounts, thereby leaving BNEC with no employees and no immediately available operating funds.

The FDIC immediately sought a purchaser for the assets and liabilities of the Bridge Banks. By letter of April 18, 1991, the Trustee in Bankruptcy for BNEC notified potential bidders, including Fleet/Norstar Financial Group Inc. ("Fleet/Norstar"), that the assets of the Bridge Banks included assets fraudulently transferred from BNEC, CBT, and MNB, and that the Trustee had a right and intended to recover these assets from any subsequent transferee. Despite these warnings, FDIC proceeded and, on April 22, 1991, announced that Fleet/Norstar was the successful bidder for certain of the assets and liabilities of the Bridge Banks.

On July 12, 1991, the OCC closed the Bridge Banks, and appointed the FDIC as their receiver ("FDIC–New BNE," "FDIC–New CBT," and "FDIC–New MNB" and, collectively, "FDIC–Receiver II"). On that same day, the Fleet Banks acquired certain assets and assumed certain liabilities of the Bridge Banks. In particular, Fleet Bank of Massachusetts, N.A. ("Fleet–Mass") acquired certain assets and assumed certain liabilities of New BNE; Fleet Bank, N.A. ("Fleet–Ct") acquired certain assets and assumed certain liabilities of New CBT; and Fleet Bank of Maine ("Fleet–Me") acquired certain assets and assumed certain liabilities of New MNB.

The chart below generally illustrates the relationships of the parties during the relevant period:

Due to the transfers of assets from BNEC to its Subsidiary Banks, BNEC's estate has been unable to pay the lawful claims of its creditors, which are in excess of $700,000,000.

## III. THE COMPLAINTS

Branch filed actions in the Districts of Massachusetts ("Mass.Complaint"), Connecticut ("Ct.Complaint"), Maine ("Me.Complaint"), and the District of Columbia ("Bridge Bank Complaint"), naming as defendants FDIC–Corporate, FDIC–Receiver I, FDIC–Receiver II (FDIC Receiver I and FDIC Receiver II are collectively referred to herein as "FDIC–Receiver"), and the Fleet Banks. All four actions were subsequently consolidated into the lead case, which this Court has withdrawn from the Bankruptcy Court.

Counts I–V of the Mass. and Bridge Bank Complaints, and Count I of the Ct. and Me. Complaints,[6] allege that the various transfers pleaded are fraudulent transfers recoverable by Branch under the Bankruptcy Code. Counts VI–IX of the Mass. and Bridge Bank Complaints assert derivative claims on behalf of CBT and MNB, alleging that transfers of federal funds from those banks to BNE violated section 91 of the NBA and section 23A of the Federal Reserve Act (FRA). Count X of the Mass. and Bridge Bank Complaints, and Count II of the Ct. and Me. Complaints, assert common law claims to remedy unjust enrichment. Count XI of the Mass.Complaint and Count III of the Ct.Complaint seek repayment of debts allegedly owed by BNE and CBT to BNEC. In a first "unnumbered count" in each complaint, Branch asserts that certain of his claims against FDIC–Receiver are entitled to recovery at 100% (with interest), rather than at a reduced or "pro rata" percentage (the "Priority Claim"). Finally, in a second unnumbered count in each complaint, Branch contends that FDIC–Corporate is liable under sections 91 and 194 of the NBA to ensure full payment of Branch's claims against FDIC–Receiver ("Deficiency Claim").[7]

## IV. ANALYSIS

The defendants have moved to dismiss Branch's Complaints upon a battery of jurisdictional and substantive defenses. On May 11, 1992, the defendants submitted motions to dismiss the Massachusetts, Connecticut and Maine Complaints. On September 8, 1992, at the hearing on these motions, this Court instructed the defendants to submit any additional bases for dismissal of the Bridge Bank Complaint. The defendants' Motion to Dismiss the Bridge Bank Complaint was then submitted on September 18, 1992, and is properly before this Court. *See* Defs.' Post–Hearing Br.

All parties are assiduous in explaining to the Court that they desire that these motions to dismiss be treated as such, and not converted into motions for summary judgment. Their tactics are not difficult to discern. In this extraordinarily complex litigation, each party seeks to learn early-on just what claims are viable and must be factually explored through discovery. Moreover, each party knows that, to the extent the lay of the legal landscape may be set out in response to the motions to dismiss, the parties may better arm themselves for the inevitable summary judgment clash.

In pursuing this course, however, the defendants undertake to hoe a very long row indeed for, in considering a motion to dismiss, a court must take all the allegations set forth in the complaint as true and must draw every reasonable inference in favor of the plaintiff. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993); *Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 988 (1st Cir.1992). Branch's complaints therefore may not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

At the outset, moreover, it is worth noting that courts should generally be reluctant to grant a motion to dismiss when the claim in question asserts a novel theory of recovery. Novel theories of recovery are best tested for legal sufficiency in light of actual, rather than alleged facts. *Electrical Const. & Maintenance Co. v. Maeda Pacific Corp.*, 764 F.2d

---

**6.** The Mass. Complaint contains Counts I–XII; the Bridge Bank Complaint Counts I–XI, the Ct. Complaint Counts I–III, and the Mc. Complaint Counts I & II. Pursuant to a Joint Stipulation submitted to this Court on October 5, 1992, all claims relating to or arising out of the transfer from BNEC to BNE of stock of BNE Airfinance (KLM) Corporation have been dismissed. Accordingly, Counts XII of the Mass. Complaint and Count XI of the Bridge Bank Complaint have been dismissed in their entirety, and Count IV of the Mass. and Bridge Bank Complaints have been dismissed as they relate to the KLM transfers.

**7.** While Branch's Deficiency Claim attempts to make FDIC–Corporate derivatively liable on each of Branch's claims against FDIC–Receiver, it is substantively separate from the underlying claims against FDIC–Receiver. Accordingly, when this Court lists the defendants to each of Branch's underlying claims *infra*, the Court omits reference to FDIC–Corporate unless it is also a direct defendant on that claim.

619, 623 (9th Cir.1985); *Shull v. Pilot Life Ins. Co.*, 313 F.2d 445 (5th Cir.1963); *In re Richmond Produce Co.*, 118 B.R. 753, 755 (Bankr.N.D.Ca., 1990) (considering "entity for whose benefit" claim, *see infra* ).

## A. THE REGULATORY ORDERS

 Under the FDIA, judicial review of OCC and FED Cease and Desist Orders may be had only through specific procedures, *see* 12 U.S.C. § 1818(b), (h), (i), and orders issued with the consent of the financial institution are explicitly exempted from judicial review. 12 U.S.C. § 1818(h)(2). The defendants contend that these several complaints constitute an impermissible collateral attack upon the FED and OCC Orders and Agreements (the "Orders and Agreements") which, among other things, required BNEC to serve as a source of financial strength to its Subsidiary Banks.[8] Specifically, the defendants claim both that Branch failed to follow the procedures prerequisite to obtaining judicial

review, and that, moreover, the Orders and Agreements are immune from review as consent orders under section 1818(h)(2). In response, Branch contends that the Orders and Agreements neither generally nor specifically required the challenged asset transfers,[9] and that, in any event, judicial review may still be had under 28 U.S.C. § 1334(d) or because the Orders were *ultra vires.*

This Court rules that none of the Orders and Agreements required the challenged asset transfers. Only the FED C & D Order and the FED MOU contain language which purports to require asset transfers from BNEC to its Subsidiary Banks, and neither of these documents attempts to define the manner of transfer or the specific assets to be transferred.[10] Thus, while Branch's Complaints may indeed constitute attacks upon the discretionary *execution* of the Orders and Agreements, they do not represent attacks upon the Orders and Agreements themselves. Similarly, while the OCC Orders and

8. Although the FED and OCC Orders and Agreements (as well as the Purchase and Assumption Agreements) are incorporated in Branch's Complaints only by reference, their authenticity is not disputed and it is well established that a district court may take judicial notice of public records or indisputably authentic documents on a 12(b) motion without converting even a 12(b)(6) motion into one for summary judgment. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993); *Mack v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1282 (9th Cir.1986); *see also Land v. Dollar*, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 1011 n. 4, 91 L.Ed. 1209 (1947) (affidavits and other evidence may be considered to determine subject matter jurisdiction).

9. Branch also contends (i) that the defendant's arguments concerning the OCC Orders and Agreements may not be asserted against BNEC since it was not a party to those orders; and (ii) that the FED MOU is not an "Order" under 12 U.S.C. § 1818. Since the Court rules that none of the Orders and Agreements required the challenged asset transfers, the Court need not address these issues.

10. The FED C & D Order provides in pertinent part:

[BNEC] shall submit to the [FED] a written plan to improve the capital positions of the consolidated organization and each of the Subsidiary Banks.... The plan shall, at a minimum, address and consider: ... (e) [BNEC's] responsibility to act as a source of financial strength to its Subsidiary Banks and, in con-

nection therewith, to use its assets to provide whatever additional capital support to all its Subsidiary Banks as may be required by the Reserve Bank in a manner consistent with the [FED's] Policy Statement on the responsibility of bank holding companies to act as sources of financial strength to the subsidiary banks. (Defs.' App. Ex. 3.B ¶ 7; *see also* FED MOU, Defs.' App. Ex. 3.A.)

Along with their post-hearing brief, the defendants submitted two "capital maintenance plans," (Defs.' App. Exs. 10, 11), allegedly created by BNEC pursuant to the FED C & D Order and FED MOU. These plans make specific reference to some, but not all, of the challenged asset transfers, and the FED C & D Order contains language which might arguably convert at least the second plan into an "Order" under section 1818. (*See* FED C & D Order, Defs.' App. Ex. 3.B ¶ 7, 12.) Theoretically, this Court could consider the plans either as public records of the FED, or as external evidence used to determine the Court's subject matter jurisdiction. At this juncture, however, this Court declines to do either. As Branch justifiably argues, the plans were submitted after the presentation of briefs and oral argument and are technically outside the scope of the supplemental briefs requested by the Court. Branch was thus provided no adequate opportunity to respond to the plans. Moreover, although the Court doubts that the plans are concocted, the defendants have presented no affidavits supporting their authenticity. For these reasons, the Court cannot in good conscience consider the plans for the purposes of the present motion.

Agreements specifically allow for federal funds sales, they mandate neither specific federal funds transfers nor the manner in which the challenged federal funds transfers were to be accomplished. (*See, e.g.,* OCC/ BNE C & D Order, Defs.' App.Ex. 4.B, Article V.)

Accordingly, the Court rules that the Complaints do not constitute a collateral attack upon the FED and OCC Orders and Agreements, and thus the Court need not reach the subsidiary issues raised by Branch.

## B. BANKRUPTCY CODE CLAIMS

In Counts I–V of the Mass. and Bridge Bank Complaints and Count I of the Ct. and Me. Complaints, Branch seeks, under the fraudulent conveyance provisions of the Bankruptcy Code, recovery of the assets transferred both downstream from BNEC to the Subsidiary Banks, and sidestream from CBT and MNB to BNE. Branch alleges that these transfers were made either (i) with actual intent to hinder, delay or defraud BNEC's creditors; or (ii) were made for less than reasonably equivalent value at a time when BNEC was either already insolvent or was rendered insolvent thereby, was left with unreasonably small capital, or believed or intended that its debts would be beyond its ability to pay. *See* 11 U.S.C. §§ 548(a)(1), (2); Mass.Gen.L. ch. 109A §§ 4, 5, 6, 7 (incorporated into the Bankruptcy Code via 11 U.S.C. § 544[b]). Branch seeks recovery of the transferred assets or their equivalent value from FDIC–Receiver I as the initial transferee, from FDIC–Receiver II and Fleet as subsequent transferees, and from FDIC–Corporate as the entity for whose benefit the transfers were made. *See* 11 U.S.C. § 550(a).

### 1. Compliance with Regulatory Orders

The defendants argue that since, they insist, the FED and OCC Orders and Agreements required the challenged asset transfers, the transfers are therefore immunized from attack under the Bankruptcy Code ei-

ther because (i) a transfer legally-mandated by the FED or OCC pursuant to its regulatory authority is automatically made in good faith and for fair consideration under the Bankruptcy Code; or (ii) federal banking law preempts the Bankruptcy Code. As previously discussed, the FED and OCC Orders and Agreements did not require the challenged transfers. Accordingly, the Court rules that the transfers are subject to the Bankruptcy Code without consideration of these underlying legal issues.

### 2. Transfers to CBT and MNB "For Value"

Branch alleges that CBT and MNB were solvent until January 4, 1991. Yet, in order to prevail on his Bankruptcy Code claims under sections 548(a)(2) and 544(b)—to the extent his claims are based upon Mass. Gen.L. ch. 109A §§ 4, 5, 6—Branch must prove that the transfers to CBT and MNB before that date were made for "less than reasonably equivalent value" and "without fair consideration." [11] The defendants contend that transfers to solvent subsidiaries always involve an even exchange of value since the value of the transferred asset is repaid to the parent by an increase in the value of the subsidiaries' stock. Accordingly, the defendants seek to dismiss Branch's claims under the above-cited provisions to the extent they are based upon transfers to CBT and MNB prior to January 4, 1991. In response, Branch stands by his allegations that CBT and MNB were solvent until January 4, 1991; but argues that the transfers to CBT and MNB nonetheless lacked adequate consideration because of the deep insolvency of CBT's and MNB's sister institution BNE.

Whether a transfer is made for fair consideration is a question of fact. *In re Roco Corp.*, 701 F.2d 978, 981–82 (1st Cir. 1983); *Klein v. Tabatchnik*, 610 F.2d 1043, 1047–48 (2d Cir.1979); *In re Lawrence Paperboard Corp.*, 76 B.R. 866, 873 (Bankr. D.Mass.1987). Generally, transfers to a solvent subsidiary are considered to be for rea-

---

**11.** Proof of this element is not required under sections 548(a)(1) or 544(b) to the extent his claims are based on Mass.Gen.L. ch. 109A § 7, since this section requires only proof that the transfers were made with actual intent to hinder, delay, or defraud. Thus, Branch's claims under this later provision are not endangered by the defendants' solvency defense.

sonably equivalent value because, since the parent is the sole stockholder of the subsidiary corporation, any benefit received by the subsidiary is also a benefit to the parent. *In re Metro Communications, Inc.,* 95 B.R. 921, 933 (Bankr.W.D.Pa.1989), *rev'd on other grounds,* 945 F.2d 635 (3d Cir.1991); *In re Lawrence Paperboard Co.,* 76 B.R. at 871. The Court is aware of no case in which transfers to a solvent subsidiary have been determined to be for less than equivalent value. Nevertheless, the Court is not prepared to foreclose the possibility that, under certain circumstances, the presumption in favor of fair or equivalent consideration might be overcome. *See Johnson v. First Nat'l Bank,* 81 B.R. 87, 89 (Bankr.N.D.Fla.1987) ("[a] loan to a subsidiary corporation will almost always confer a benefit on the parent [but the] remaining question is the adequacy of the consideration received."); *In re Royal Crown Bottlers of N. Ala., Inc.,* 23 B.R. 28, 30 (Bankr.N.D.Ala.1982) ("the passing to a subsidiary of the consideration for a transfer by a debtor-parent may be presumed to be substantial"); *see also* R. Rasmussen, *Guarantees and Section 548(a)(2) of the Bankruptcy Code,* 52 U.Chi.L.Rev. 194, 215–216 (1985) (discussing the difficulty in assessing whether transfers between affiliated corporations are made for reasonably equivalent value and suggesting that a *rebuttable* presumption in favor of fair consideration be employed to govern transfers from parents to subsidiaries). Accordingly, this Court will subject Branch's claims to a rebuttable presumption that transfers to a solvent subsidiary are made for reasonably equivalent value.

Here, Branch alleges that the transfers from BNEC to the solvent MNB and CBT were made at a time when those banks' sister institution, BNE, to the knowledge of BNEC's Directors and the Regulators, was deeply and hopelessly insolvent. Branch alleges that the deep insolvency of BNE, and the inevitability of its takeover by the FDIC, raised the real possibility that the FDIC would assert a cross-guarantee assessment against MNB and CBT under 12 U.S.C. § 1815(e),[12] thereby wiping out CBT's and MNB's net worth and value to BNEC (MNB was in fact rendered insolvent by such a demand on January 6, 1991). The Court agrees with Branch that under these circumstances, the transfers of assets from BNEC to CBT and MNB may indeed not have produced reasonably equivalent value since, among other things, the value of the stock received by BNEC would have to be discounted for the probability that the FDIC would use its cross-assessment powers to render the stock valueless. Accordingly, at least for the purposes of surviving a motion to dismiss, the Court rules that Branch's allegations are sufficient to overcome the presumption in favor of equivalent value,[13] and hence deny the defendants' motion to dismiss.

### 3. Tax Refund Claim

Among his Bankruptcy Code claims against FDIC–Receiver II, Branch seeks to recover tax refunds allegedly fraudulently transferred from BNEC to the Subsidiary Banks, and then purchased by the Bridge Banks. FDIC–Receiver II moves to dismiss this claim on the basis that it represents a compulsory counterclaim in the "Accounts

12. The FDIC is explicitly authorized under the cross-guarantee provisions of 12 U.S.C. § 1815(e) to assess a commonly controlled institution "for any loss [the FDIC] has incurred" or "any loss that it reasonably anticipates incurring" in connection with the default of a sister institution. *See* 12 U.S.C. § 1815(e)(1)(A).

13. Although the Ct. and Me. Complaints never specifically mention the probability of cross-guarantee claims or their possible effect on CBT's and MNB's stock value, the Court rules that these complaints are sufficient to support this argument. *See, e.g.,* Ct. Complaint ¶ 43 ("[a]s a result of the Regulators' control of

BNEC's Board of Directors ... assets were transferred to CBT ... at a time when the Regulators were aware [BNE] was hopelessly insolvent. Thus the transfers complained of were given either for no consideration or for consideration of far less than reasonable value."); Me. Complaint, ¶ 43 (same for MNB). Drawing all reasonable inferences in favor of Branch, *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir.1993), it does not appear "beyond doubt that the plaintiff can prove no set of facts in support of his claim which should entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

Case," C.A. No. 91–10976–Y. This defense, submitted by FDIC–Receiver II for the first time in its post-hearing brief, is tardy and thus ˙technically outside the scope of the present motion. The Court notes, however, that since the Accounts Case and these fraudulent transfer cases are now consolidated before this Court, dismissal of Branch's claim to recover tax refunds would not serve the purposes of Fed.R.Civ.P. 13(a) even if it were a compulsory counterclaim in the Accounts Case. *See, e.g., Provident Life & Acc. Ins. Co. v. United States,* 740 F.Supp. 492, 496 (E.D.Tenn.1990); 6 C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure 2d* § 1418, at 147 (1983 & Supp.1991). Accordingly, FDIC–Receiver II's motion to dismiss Branch's claim to recover tax refunds is denied.

### 4. "Entity for Whose Benefit"

Branch's Bankruptcy Code claims seek recovery from FDIC–Corporate under section 550(a)(1), which provides that "the trustee may recover ... the property [fraudulently] transferred, or ... the value of such property, from ... the initial transferee ... or *the entity for whose benefit such transfer was made.*" 11 U.S.C. § 550(a)(1) (emphasis added). As discussed above, Branch alleges that FDIC–Corporate, in concert with the OCC and FED, engineered the challenged transfers in order to reduce FDIC–Corporate's overall costs in handling the failure of the Subsidiary Banks, and that FDIC–Corporate received the benefit of these transactions to the detriment of BNEC's existing creditors.[14]

The question for this Court is whether these alleged facts are sufficient to survive a motion to dismiss under section 550(a)(1).

▇ FDIC–Corporate advances two arguments why Branch's claim should fail as matter of law. First, FDIC–Corporate contends that its role as insurer and regulator of banks sets it outside the description of an "entity" which benefits under section 550(a)(1). FDIC–Corporate argues that section 550(a)(1) allows recovery from only two types of entities—a debtor of the initial transferee, or a guarantor of the debtor's debt to the initial transferee—and contends that FDIC–Corporate meets neither description but is rather an insurer, within limits, of funds deposited with the bank. Second, FDIC–Corporate argues that a reduction in the FDIC's handling costs, and specifically a reduction in the FDIC's insurance liability, is not a "benefit" as contemplated by section 550(a)(1), but is rather a ˙co-incidental byproduct of the FED's and OCC's regulatory actions.[15]

FDIC–Corporate appears to afford section 550(a)(1) far too limited a scope. The provision applies on its face to any "entity" for whose benefit a transfer is made, and contains no express limitation upon the type of "benefit" required. Courts have, in fact, applied section 550(a)(1) to many "entities" and "benefits" outside the "paradigm" examples provided by FDIC–Corporate. *See, e.g., Max Sugerman Funeral Home, Inc. v. A.D.B. Investors,* 926 F.2d 1248, 1255–56 (1st Cir.1991) (debtor transferred assets to two

---

**14.** Although irrelevant for the purposes of the present motion since Branch's factual allegations must be taken as true, Branch's claims appear to have evidentiary support. Two days after BNE was seized, and seeking to justify the decision to keep BNE open, the Comptroller of the Currency testified before Congress:

> We believe that the loss to the FDIC did not increase, and may well have been reduced, due to the efforts of the new management team. These efforts included the sale of [BNEC's] assets and the downstreaming of the sale proceeds to the Bank. *Had [BNE] been closed earlier, these assets would have been left behind in [BNEC] and would not have been available to reduce the FDIC's eventual resolution cost.*
> *Failure of the Bank of New England: Hearing Before the House Comm. on Banking, Finance,*

*and Urban Affairs,* 102d Cong., 1st Sess. 64 (statement of Robert L. Clarke, Comptroller of ˙the Currency) (emphasis added); *see also id.* at 66–67.

**15.** FDIC–Corporate also suggests that Branch ˙has failed to show both that FDIC–Corporate controlled the challenged transfers and that˙ FDIC–Corporate received the intended benefit of these transfers. FDIC–Corporate raises interesting issues, *see In re Richmond Produce Co.,* 118 B.R. 753, 757–58 (Bankr.N.D.Cal.1990) (discussing whether assertion of control and actual receipt of benefits are prerequisites to recovery under "entity for whose benefit" provision), but the Court need not address them for the present since Branch's Complaints adequately allege that FDIC–Corporate both participated in and benefitted from the challenged assets transfers.

entities which were entirely owned and controlled by a judgment creditor and which assumed the debtor's obligations to that creditor but not to other creditors—preferred creditor was "entity for whose benefit" transfer was made); *In re Air Conditioning, Inc.*, 845 F.2d 293, 299 (11th Cir. 1988) (beneficiary of bank letter of credit securing the beneficiary's claim against the debtor was an entity for whose benefit the debtor had transferred property to the bank to obtain the letter of credit), *cert. denied*, 488 U.S. 993, 109 S.Ct. 557, 102 L.Ed.2d 584 (1988); *In re Compton Corp.*, 831 F.2d 586, 595 (5th Cir.1987) (same), *modified on other grounds on reh'g*, 835 F.2d 584 (5th Cir. 1988); *see also In re Richmond*, 118 B.R. at 758 ("it would be nonsensical to conclude that existing case law has exhausted every possible type of entity from whom recovery may be obtained"). Moreover, the distinction that FDIC–Corporate attempts to draw between a guarantor and an insurer is to a large extent illusory: just like a guarantor, an insurer has a duty to make payments if properly called upon, and benefits when fraudulent transfers reduce the cost of carrying out that duty. Thus, Branch appears to state a claim against FDIC–Corporate logically encompassed within the broad reach of section 550(a)(1).

Congress has explicitly provided that FDIC–Corporate may "sue and be sued ... in any court of law or equity." 12 U.S.C. § 1819(a). The Supreme Court has stated that such "sue and be sued" provisions are to be "liberally construed." *Franchise Tax Bd of Ca. v. United States Postal Serv.*, 467 U.S. 512, 517, 104 S.Ct. 2549, 2552–53, 81 L.Ed.2d 446 (1987). Accordingly, in the absence of evidence that Branch's claim falls outside the ambit of section 550(a)(1), the Court rules that Branch states a claim against FDIC–Corporate under that section.

## C. DERIVATIVE CLAIMS

In Counts VI–IX of the Mass. and Bridge Bank Complaints, Branch asserts derivative claims on behalf of CBT and MNB alleging that the January 4, 1991 transfers of federal funds from CBT and MNB to BNE violated section 91 of the NBA and section 23A of the FRA. Under both acts, Branch seeks recovery of the purchase price of the transferred funds from FDIC–BNE as the initial transferee, and from FDIC–New BNE and Fleet–Mass as subsequent transferees. In addition, under his FRA claims only, Branch seeks recovery from FDIC–Corporate as well.

### 1. Derivative Standing

As a threshold matter, this Court must decide whether Branch, as Chapter 7 Trustee of BNEC and hence as the sole shareholder of CBT and MNB, has standing to bring suit derivatively on behalf of those banks.

Normally, the responsibility for determining whether a corporation should institute or terminate litigation is, like other business questions, a matter of internal management left to the discretion of the corporation's directors. *United Copper Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 263, 37 S.Ct. 509, 510, 61 L.Ed. 1119 (1917). Shareholders thus ordinarily must make demand upon the corporation's directors before commencing suit on behalf of the corporation, and a proper exercise of business judgment by the directors not to institute litigation generally will preclude the shareholders from bringing a derivative suit. Only in rare circumstances, such as "where the directors are guilty of misconduct equal to a breach of trust, or where they stand in a dual relation which prevents an unprejudiced exercise of judgment," do courts allow shareholder derivative actions to proceed against the wishes of the directors or in the absence of demand. *Id.* at 264, 37 S.Ct. at 510; *Marquis Theatre Corp. v. Condado Mini Cinema*, 846 F.2d 86, 91 (1st Cir.1988); *Hasan v. CleveTrust Realty Investors*, 729 F.2d 372, 377 (6th Cir.1984) (applying Massachusetts law); *see also* Fed. R.Civ.P. 23.1.

Similar principles apply when a bank is placed in receivership, except that the receiver stands in place of, and represents the interests of, the insolvent bank. *Landy v. Federal Deposit Ins. Corp.*, 486 F.2d 139, 147 (3d Cir.1973) (citations omitted), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). The receiver becomes entrusted with the responsibility of

deciding if and when to commence litigation on behalf of the insolvent bank, and any demand to bring suit must be made on the receiver rather than the directors. *Id.* As in the normal corporate context, however, "when a receiver refuses to bring suit or 'where it would be a vain thing to make a demand upon [it], and it is shown there is a necessity for a suit for the protection of the interests of creditors,' a stockholder is free to sue" even against the wishes of the receiver or in the absence of demand. *Id.* at 148–49 (citing *O'Connor v. Rhodes*, 79 F.2d 146, 149 (D.C.Cir.1935), *aff'd sub nom.*, 297 U.S. 383, 56 S.Ct. 517, 80 L.Ed. 733 (1936)).

These rules routinely apply to FDIC receiverships as well. *Landy*, 486 F.2d at 147 (citations omitted); *see Gaubert v. United States*, 885 F.2d 1284, 1290 n. 6 (5th Cir. 1989), *rev'd on other grounds*, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991); *Federal Deposit Ins. Corp. v. American Bank*, 558 F.2d 711, 716 (4th Cir.1977); *In re Longhorn Sec. Litig.*, 573 F.Supp. 255, 272 (W.D.Okla.1983).

Branch alleges that he demanded on May 16, 1991 that FDIC–CBT and FDIC–MNB bring suit on behalf of CBT and MNB. It is undisputed that FDIC–CBT and FDIC–MNB never asserted these claims. Branch argues that the FDIC has several conflicts of interest which prevent it from exercising unprejudiced judgment with respect to the claims at issue, and which therefore warrant this Court allowing derivative standing: (1) the FDIC would be suing itself; and (2) the

FDIC took part in and benefitted from the events giving rise to the federal funds claims.[16]

The defendants advance two main grounds for denying Branch derivative standing. First, the defendants claim that 12 U.S.C. § 1821(d)(2)(A)(i) of the FDIA, as recently enacted by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183, *reprinted in* 1989 U.S.C.C.A.N. 183, expressly alters the common law rule that shareholders of failed national banks may assert derivative claims. Second, and in the alternate, the defendants contend that the conflicts of interest alleged here are all explicitly authorized by Congress and hence cannot constitute wrongdoing which impairs the FDIC's business judgment.[17]

Turning first to the defendants' statutory defense, section 1821(d)(2)(A)(i) specifically provides that the FDIC, "as conservator or receiver, and by operation of law, succeeds to—

> (i) *all rights, titles, powers and privileges* of the insured depository institution, and *of any stockholder,* member, accountholder, depositor, officer, or director of such institution *with respect to the institution and the assets of the institution.*"

12 U.S.C. § 1821(d)(2)(A)(i) (emphasis added). No comparable language existed in the superseded version of section 1821(d). The defendants contend that this section unequivocally and unambiguously places all incidents of ownership with FDIC–Receiver, thereby

---

**16.** In addition to his conflicts of interest arguments, Branch also claims that the defendants fail to show that FDIC–CBT and FDIC–MNB made conscious, affirmative, and well-informed decisions not to commence litigation on behalf of CBT and MNB, and hence argues that issues of fact preclude dismissal of his derivative claims. Because the Court rules that, at this stage, the FDIC's apparent conflicts of interest preclude application of the business judgment rule, *see* discussion *infra*, the Court need not address this issue.

**17.** The defendants also claim in passing that Branch lacks derivative standing because FDIC–CBT and FDIC–MNB transferred their "claim[s] regarding the federal funds sale[s] to New CBT [and New MNB] for fair market value." The Fourth Circuit has held that the derivative rights of shareholders are lost after the failed institu-

tion's claims have been sold for value. *See, e.g., Bauer v. Sweeny*, 964 F.2d 305, 307–08 (4th Cir. 1992); *American Bank*, 558 F.2d at 714–16. In such cases, the recipient obtains sole ownership of the causes of action unless its title is defeated by a successful attack upon the appointment of the receiver or upon the validity of the sale and purchase. *Id.* at 715. Even had the FDIC sufficiently raised this defense, *see United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990) (arguments not adequately developed are considered waived), Branch's complaints here sufficiently allege the invalidity of the Purchase and Assumption Agreements both between FDIC–CBT and New CBT, and between FDIC–MNB and New MNB, (*e.g.*, Mass.Compl. ¶ 171), so that the Court need not now decide whether to adopt the Fourth Circuit's approach.

leaving it the sole owner of, and sole party entitled to assert, the insolvent bank's causes of action. The defendants also suggest that since under section 1821(2)(d)(A)(i) the shareholders of a failed national bank effectively cede their shares to the FDIC upon its appointment as receiver, Branch therefore fails to meet a fundamental requirement for bringing a derivative suit—that the shareholder retain stock ownership for the duration of the derivative suit. *See Lewis v. Chiles,* 719 F.2d 1044, 1047 (9th Cir.1983). In response, Branch argues that while section 1821(d)(2)(A)(i) codifies the common law rule that FDIC–Receiver, like other receivers, steps into the shoes of the bank upon its failure, it does not alter the settled rule that seized banks' shareholders may pursue derivative actions. It appears that no court has addressed this issue.

As the party contending that legislative action has changed settled law, the defendants have the burden of showing that the legislature intended such a change. *Green v. Bock Laundry Machine Co.,* 490 U.S. 504, 521, 109 S.Ct. 1981, 1991, 104 L.Ed.2d 557 (1989). "Congress is understood to legislate against a background of common-law adjudicatory principles. Thus, where a common-law principle is well established, ... the courts may take it as a given that Congress has legislated with an expectation that the principle will apply except 'when a statutory purpose to the contrary is evident.'" *Astoria Fed. Sav. & Loan Ass'n v. Solimino,* — U.S. —, — – —, 111 S.Ct. 2166, 2169–70, 115 L.Ed.2d 96 (1991) (citations omitted). Here, the FDIC identifies no legislative history which supports its interpretation of section 1821(d)(2)(A)(i), and thus, to discern Congressional intent, the Court must rely upon the specific language used in section 1821(d)(2)(A), as well as upon the section's placement within the overall statutory framework.

Section 1821(d)(2)(A)(i) employs strong language: FDIC–Receiver "*succeeds to ... all rights, titles, powers and privileges ... of any stockholder ...* with respect to the institution and the assets of the institution." 12 U.S.C. § 1821(d)(2)(A)(i) (emphasis added). Applying the common definition of

"succeed," section 1821(d)(2)(A)(i) would appear to establish in FDIC–Receiver exclusive rather than concurrent stock ownership rights. *See American Heritage Dictionary* 1214 (2d Ed.1985) (succeeds: "[t]o come next in time or succession; follow after, esp. to replace another in office or position"); *Blacks Law Dictionary* 1283 (5th Ed.1979) (successor: "one who takes the place that another has left, and sustains the like part or character"). Thus, looking only at the language used, it would seem that section 1821(d)(2)(A)(i) might indeed divest shareholders of any rights they might have with respect to the failed institution, including the right to assert a derivative action.

Section 1821(d)(11)(B), however, substantially undermines a literal interpretation of section 1821(d)(2)(A)(i). Under section 1821(d)(11)(B), also enacted in 1989 by FIRREA, the shareholders of a failed national bank remain entitled to "distribution ... of amounts remaining [in the receivership] after payment of all other claims and expenses." 12 U.S.C. § 1821(d)(11)(B). Thus, through section 1821(d)(11)(B), failed financial institutions' shareholders retain virtually the same rights as do the shareholders of any other bankrupt corporation—the rights to the residual assets once debts to higher priority creditors have been satisfied. Therefore, despite its strong language, section 1821(d)(2)(A)(i) does not transfer all incidents of stock ownership.

In light of the language and juxtaposition of these two sections, this Court cannot conclude that Congress intended to preserve shareholders' rights to the residual assets of the failed financial institution, yet terminate the shareholders' ability to protect the failed institution's interests. Such a bold departure from common law adjudicatory principles would place unfettered discretion in the hands of FDIC–Receiver, and might deny shareholders any avenue of redress should the FDIC improperly neglect to assert the failed institution's rights. In the absence of legislative history supporting such a decisive derogation of shareholders' common law rights, the Court cannot interpret section 1821(d)(2)(A)(i) to divest failed institutions' shareholders of their rights to assert a deriv-

ative action on behalf of the failed institution. Accordingly, the Court rules that section 1821(d)(2)(A)(i) does not alter the settled rule that shareholders of failed national banks may assert derivative claims.[18]

■ This said, the Court now must decide whether Branch alleges conflicts of interest sufficient to preclude FDIC–Receiver's resort to the business judgment rule. As stated before, Branch claims that the FDIC has the following irreconcilable conflicts of interest which prevent an exercise of unprejudiced judgment: (1) the FDIC would be suing itself; and (2) the FDIC took part in and benefitted from the events giving rise to the federal funds claims. In response, the defendants claim that Congress expressly contemplated and authorized each of these conflicts under the statutory scheme, and hence argue that these conflicts cannot constitute wrongdoing which impairs FDIC–Receiver's business judgment. The defendants point out that (1) bank holding companies are allowed to control more than one national banking institution and the FDIC by necessity becomes receiver of all such institutions, see 12 U.S.C. §§ 1821, 1841–50; (2) FDIC–Corporate, as the insurer of a failed national bank (and hence a creditor of the bank's receivership estate), is explicitly authorized to deal with "itself" as receiver of the bank, see 12 U.S.C. § 1821(d); and (3) FDIC–Corporate is explicitly authorized under the cross-guarantee provisions of 12 U.S.C. § 1815(e) to assess a commonly controlled institution "for any loss [the FDIC] has incurred" or "any loss that it reasonably anticipates incurring" in connection with the default of a sister institution. See 12 U.S.C. § 1815(e)(1)(A).

The FDIC, however, asks these statutes to carry too heavy a burden. Here, Branch alleges conduct by the FDIC—and hence

resulting conflicts of interest—which far exceed those contemplated and authorized by Congress. Branch alleges that FDIC–Corporate both participated in and benefitted from the alleged wrongful transactions forming the basis for his claims. FDIC–Corporate itself is a direct defendant on Branch's FRA claims, and is a derivative defendant on Branch claims under both the NBA and FRA.[19] In addition, regardless of whether the FDIC could conceivably have obtained the same result under its cross-guarantee authority, the cross-guarantee provisions provide specific procedures and review mechanisms for loss assessments, see 12 U.S.C. § 1815(e)(2), (3), and thus do not sanction transfers of the type alleged by Branch. Should these circumstances be borne out by the evidence, Branch will be allowed to maintain these derivative suits even in the absence of demand. See, e.g., O'Connor v. Rhodes, 79 F.2d 146, 148 (D.C.Cir.1935) ("when the Comptroller [the receiver] himself is charged with being an original party to an alleged unlawful contract … demand in such case is unnecessary [and] the right of a creditor to sue in his own name ought not to be questioned."), aff'd, 297 U.S. 383, 56 S.Ct. 517, 80 L.Ed. 733 (1936); Golden Pacific Bancorp. v. Clarke, 5 Fed.R.Serv.3d (Callaghan) 519, 522, 1986 WL 13881 (D.C.1986) ("[a]s the receiver of the Bank, the FDIC cannot be expected to sue either itself or other federal agencies for improperly declaring the bank to be insolvent. Indeed, the Bank is now in the hands of the very entity that needs to be sued to vindicate the Bank's rights"); compare Hulse v. Argetsinger, 12 F.2d 933, 936 (D.C.N.Y.1926) ("no fraud or collusive conduct shown"); Landy, 486 F.2d at 148–49 (same).

Accordingly, based upon the allegations of misconduct in this case, the Court rules that the FDIC may stand in a "dual relationship

**18.** The Ninth Circuit has actually allowed a bank holding company direct standing to sue on behalf of an insolvent bank subsidiary on the theory that compensation to the receivership results in a surplus in which the shareholder possesses a direct interest under section 1821(d)(11)(B). California Housing Securities, Inc. v. United States, 959 F.2d 955, 957 n. 2 (9th Cir.1992) (the government conceded direct standing and thus the Court did not reach the issue of derivative standing), cert. denied, — U.S. —, 113 S.Ct.

324, 121 L.Ed.2d 244 (1992). Since the Court rules that Branch has derivative standing, the Court need not address whether Branch might have direct standing as well.

**19.** As discussed infra, FDIC–Corporate may be liable under Branch's Deficiency Claim to ensure payment of Branch's NBA and FRA claims against FDIC–Receiver.

which prevents an unprejudiced exercise of judgment." The motion to dismiss the derivative claims on these ground is, accordingly, denied.

### 2. Federal Reserve Act Claims

Section 23A of the FRA, 12 U.S.C. § 371c, provides that extensions of credit between bank affiliates, including sales of federal funds, see 12 C.F.R. § 7.7365, must be "on terms and conditions that are consistent with safe and sound banking practices." 12 U.S.C. § 371c(a)(4). In Counts VII and IX of the Mass. and Bridge Bank Complaints, Branch alleges that CBT's and MNB's January 4, 1991 sales of such an amount of federal funds to a deeply insolvent BNE as would render CBT and MNB themselves insolvent if BNE were closed, constituted unsafe and unsound extensions of credit to an affiliate in violation of section 371c(a)(4). Branch seeks recovery of the purchase price of the federal funds from FDIC–BNE as the initial transferee, from FDIC–New BNE and Fleet–Mass as subsequent transferees, and from FDIC–Corporate.[20] Branch admits that the FRA provides him no express cause of action, but argues that this Court should imply a private right of action to empower him to maintain these claims.

■ Litigants attempting to assert implied rights of action confront "[a] formidable obstacle," *Royal Business Group v. Realist, Inc.,* 933 F.2d 1056, 1060 (1st Cir.1991), for " '[the Supreme] Court has long since abandoned its hospitable attitude towards implied rights of action.' " *Arroyo–Torres v. Ponce Federal Bank,* 918 F.2d 276, 278 (1st Cir. 1990) (quoting *Thompson v. Thompson,* 484 U.S. 174, 190, 108 S.Ct. 513, 521, 98 L.Ed.2d 512 [1988] [Scalia, J., concurring in judgment] ). Unless congressional intent to allow a private right of action "can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." *Thompson,* 484 U.S. at 179, 108 S.Ct. at 516; *Stowell v. Ives,* 976 F.2d 65, 70 n. 5 (1st Cir.1992).

Thus, in determining whether to imply a private right of action under section 371c, this Court's central focus must be on Congress' intent in enacting the statute. *Thompson,* 484 U.S. at 179, 108 S.Ct. at 516; *Sterling Suffolk Racecourse Ltd. Partnership v. Burrillville Racing Ass'n, Inc.,* 989 F.2d 1266 (1st Cir.1993).

■ To discern Congressional intent, courts commonly employ four questions provided by the Supreme Court: First, is the plaintiff one of the class for whose *especial* benefit the statute was enacted—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create or deny such a remedy? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy? Finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087–88, 45 L.Ed.2d 26 (1975); *see e.g., Thompson,* 484 U.S. at 179, 108 S.Ct. at 516; *Royal Business Group,* 933 F.2d at 1060. These questions, "although clearly subordinate to the 'central inquiry' into congressional intent," remain useful '[a]s guidelines to discerning that intent.' " *Royal Business Group,* 933 F.2d at 1060 (citing *Touche Ross & Co. v. Redington,* 442 U.S. 560, 574–76, 99 S.Ct. 2479, 2488–89, 61 L.Ed.2d 82 [1979]; *Thompson,* 484 U.S. at 179, 108 S.Ct. at 516).

It appears that only two courts have addressed attempts by bank shareholders or creditors to assert legal claims under the FRA against a national bank or the FDIC, and these courts arrived at somewhat inconsistent conclusions. In neither case did the court apply the *Cort* analysis. In *Blaney v. Florida Nat'l Bank,* 357 F.2d 27 (5th Cir. 1966), the Fifth Circuit addressed bank creditors' claims against a national bank for failure to comply with federal reserve regulations promulgated under 12 U.S.C. § 92a (then 12 U.S.C. § 248(k)), requiring national

---

**20.** Branch does not define the precise manner in which his FRA claims might encompass liability for FDIC–Corporate, which was allegedly only an indirect beneficiary of the challenged federal funds transfers.

banks to conform to sound principles in the operation of a trust department. After reviewing the purpose and structure of the FRA, the Court ruled that the FRA's enforcement provisions (through which section 371c[a][4] is enforced as well) are exclusive, and thus denied the bank creditors a right of action. *Id.* at 30. Yet in *Senior Unsecured Creditors' Committee v. Federal Deposit Ins. Corp.*, 749 F.Supp. 758, 768, 771–72 (N.D.Tex.1990), the District Court for the Northern District of Texas addressed bank shareholders' claims against FDIC–Corporate and several national bank receiverships under the precise subsection asserted here (section 371c[a][4] ), and held that, since "the FDIC ... presented no basis to avoid the litany of cases that have found the FDIC's actions subject to review under the NBA and other federal banking statutes," plaintiff shareholders stated a valid cause of action. *Id.* at 768, 771–72. The *Senior Unsecured Creditors'* court cited one FRA-related case, *MCorp Financial, Inc. v. Board of Governors Federal Reserve System*, 900 F.2d 852, 858–59 (5th Cir.1990) (reviewing FED's authority to issue cease-and-desist orders under the FRA), *aff'd and rev'd on other grounds*, —— U.S. ——, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991), and one NBA-related

case, but conducted no further analysis.[21] *Id.* at 722.

■ This Court, after applying the *Cort* factors to the claims Branch asserts here, rules that Branch has no private right of action under section 371c(a)(4) for his claims against FDIC–BNE, FDIC–New BNE, Fleet–Mass, and FDIC–Corporate.

Turning first to the especial benefit question, it is apparent both from the language of section 371c and the provisions through which it is enforced, sections 501a and 504, that the intended primary beneficiaries of section 371c are bank depositors and creditors. *See* 12 U.S.C. §§ 371c, 501a, 504 (providing the FED and OCC authority to remedy violations of section 371c);[22] *see also* S.Rep. No. 536, 97th Cong., 2d Sess. 1, *reprinted in* 1982 U.S.C.C.A.N. 3054, 3055. In several respects, however, section 371c "gives [member banks and their shareholders] a 'benefit' that is 'especial,' at least when compared with the benefit conferred on the general public." *Interface Group, Inc. v. Mass. Port Authority*, 816 F.2d 9, 16 (1st Cir.1987) (airline carriers receive some benefit under Anti–Head–Tax Act although primary beneficiaries are air travelers).[23] First, due to the

21. Neither of the cases cited in *Senior Unsecured Creditors'* supports implying a private right of action. In *MCorp*, the court addressed a bank holding company's injunctive challenge to the FED's authority to issue cease-and-desist orders pursuant to the FRA. 900 F.2d at 858–59. This decision thus provides no support for implying a private cause of action for damages against FDIC–Corporate or a national bank receivership. Second, in *First Empire Bank v. Federal Deposit Ins. Corp.*, 572 F.2d 1361 (9th Cir.1978), *cert. denied*, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978), the NBA-related case cited in *Senior Unsecured Creditors'*, the court addressed a claim under the *NBA* for which the plaintiff bank holding company was provided an express cause of action under sections 91 and 194 of that Act. *See* 12 U.S.C. §§ 91, 194; *First Empire*, 572 F.2d at 1369.

In *Senior Unsecured Creditors'*, plaintiff bank shareholders alleged that guaranties issued by several national banks pursuant to an Agreement with the FDIC constituted unsafe and unsound banking practices under section 371c(a)(4). 749 F.Supp. at 761, 768. The court appears to have allowed a cause of action under section 371c(a)(4) for damages against FDIC–Corporate and FDIC–Receiver. To the extent that the holding of *Senior Unsecured Creditors* is inconsistent

with the result reached here, this Court respectfully disagrees with that court's holding.

22. 12 U.S.C. § 501a provides in pertinent part:

Should any national banking association ... fail to comply with [section 371c or any other] provisions of this chapter, [the FED by the OCC may pursue suit in United States court to have it] declared dissolved. In such cases of noncompliance or violation, ... every director who participated in or assented to the same shall be held liable in his personal or individual capacity for all damages which said bank, its shareholders, or any other person shall have sustained in consequence of such violation. 12 U.S.C. § 504 provides in pertinent part: Any member bank which violates or any officer, director, employee, agent or other person participating in the conduct of the affairs of such member bank who violates any provision of section 371c ..., or any regulation issued pursuant thereto, shall forfeit and pay a civil penalty of not more than $1,000 per day for each day during which such violation continues.

23. *But see Cohen v. Massachusetts Bay Transp. Auth.*, 647 F.2d 209, 212 (1st Cir.1981) ("*Cort*

close relationship between banks and their creditors and depositors, it seems reasonable to conclude that banks are at least integral if not primary beneficiaries of the statute. *See* S.Rep. No. 536, *reprinted in* 1982 U.S.C.C.A.N. 3054, 3085 ("the [amendments to 371c] .... protect[ ] a bank from adverse transactions with affiliates"). Moreover, section 501a, while not providing the express remedy that Branch desires, does provide to a bank and its shareholders an express cause of action against directors who participate in violations of section 371c or other banking provisions. 12 U.S.C. § 501a. *E.g., Federal Deposit Ins. Corp. v. Dannen,* 747 F.Supp. 1357, 1359–60 (W.D.Mo.1990). In light of these considerations, it seems reasonable to conclude that CBT and MNB receive some "especial benefit" under the statute.

As to the central inquiry concerning legislative intent, the Court's discussion necessarily begins with an analysis of the language of the statute itself, *Cannon v. University of Chicago,* 441 U.S. 677, 690, 99 S.Ct. 1946, 1954, 60 L.Ed.2d 560 (1979), and particularly the relevant enforcement and relief provisions. *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 13, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981). It is axiomatic that where, as here, "a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979); *see also Karahalios v. National Fed'n of Fed. Employees, Local 1263,* 489 U.S. 527, 533, 109 S.Ct. 1282, 1287, 103 L.Ed.2d 539 (1989). Here, section 501a provides to a bank or its shareholders an express remedy for violations of 371c, but only against the directors of the bank, and only in their individual capacities. At the same time, sections 501a and 504 expressly provide to the FED and OCC regulatory and monetary remedies against both the directors and the noncomplying bank itself. In light of these express remedies, it is unlikely

that "'Congress absentmindedly forgot to mention an intended private action'" in favor of a bank and its shareholders against another bank or the FDIC. *TAMA,* 444 U.S. at 20, 100 S.Ct. at 247 (quoting *Cannon,* 441 U.S. at 742, 99 S.Ct. at 1981 [Powell, J., dissenting] ). "Thus, solely as a matter of statutory construction, [the Court] would hold the remedies enumerated in Section 501a to be exclusive." *Blaney,* 357 F.2d at 30 (denying private right of action under analogous FRA provision).

Turning to the third *Cort* factor, implying a private right of action would also be inconsistent with the legislative scheme. As revealed by the legislative history to section 371c, Congress revamped section 371c in part in order to "provide [more] flexibility to the [FDIC] ... and the Federal supervisory agencies to deal with financially distressed financial institutions," and to "facilitate compliance and enforcement." S.Rep. No. 536, *reprinted in* 1982 U.S.C.C.A.N. 3054, 3055, 3085. Consistent with these objectives, section 371c empowers the FED to "issue such further regulations and orders ... as may be necessary to administer and carry out the purposes of [section 371c]," and to "exempt transactions or relationships from the requirements of [section 371c]." 12 U.S.C. § 371c(e)(1), (2). These powers are in addition to those provided to under sections 501a and 504. Thus, under the relevant statutory provisions, the FED and other supervisory agencies are granted primary and virtually exclusive enforcement authority to increase or decrease the amount of regulation under section 371c.

Allowing private lawsuits by disgruntled banks and bank holding companies against other banks and banking entities is clearly inconsistent with this legislative scheme. Branch's cause of action would allow potentially massive suits against the assets of banking institutions themselves. While such private suits might conceivably add to the total amount of enforcement under section 371c, they no doubt also would interfere with

requir[es] that the plaintiff and his class be the intended, primary beneficiaries"); *Sterling Suffolk Racecourse Ltd. Partnership v. Burrillville Racing Ass'n, Inc.,* 802 F.Supp. 662, 667 (D.R.I. 1992) (same), *aff'd,* 989 F.2d 1266 (1st Cir.1993).

In accordance with the ensuing discussion, the Court considers it appropriate, as did the *Interface Group* court, to accord the status some "especial benefit" to a secondary but integral beneficiary under the statute.

the broad enforcement authority which Congress has granted to the FED and other federal supervisory agencies carefully to set the appropriate amount of regulation. *Cf. Blaney*, 357 F.2d at 30 ("since [the trust provisions of the FRA are not] broad, remedial social legislation, we feel justified in concluding that Congress intended regulatory controls to be exercised solely by the Board of Governors [or the Comptroller, today], without room or need for supplementary enforcement"). Accordingly, the third *Cort* factor also weighs against implying a private right of action here.

Finally, regarding the fourth *Cort* factor, the desired cause of action is clearly a matter of federal concern, and thus it would not be inappropriate, given the proper legislative intent, to infer a federal cause of action here.

In sum, the Court rules that Branch, suing on behalf of two national banks, enjoys *some* degree of "especial benefit" under section 371c, and that interests of state and federal comity favor a federal as opposed to state law cause of action. These factors, however, are not dispositive. *E.g., Pacheco v. Raytheon Co.*, 777 F.Supp. 1089, 1091 (D.R.I. 1991) (an especial benefit, "while indirectly evidencing legislative intent, is not dispositive of the issue") (citing *TAMA*, 444 U.S. at 24, 100 S.Ct. at 249). Here, the plain language of the statute and its enforcement provisions, the legislative scheme, and the supporting legislative history all indicate a lack of Congressional intent to create a cause of action for a bank and or its shareholders against other banks or the FDIC. In the face of these clear indications of Congressional intent not to create such a remedy, *see TAMA*, 444 U.S. at 24, 100 S.Ct. at 249 ("[t]he dispositive question remains whether Congress intended to create a[] .... remedy"), the Court rules that Branch has no right of action to assert his claims under the FRA, and hence dismisses these claims.

*3. Viability of National Bank Act Claims*

Counts VI and VIII of the Mass. and Bridge Bank Complaints allege violations of section 91 of the NBA, which provides in pertinent part:

> [1] *All transfers* of notes, bonds, bills of exchange, or other evidence of debt owing to any national banking association, or *of deposits to [any national banking association's] credit;* [2] all assignments of mortgages ...; [3] all deposits of money, bullion, or other valuable thing for its use, or for the use of any of its shareholders or creditors; and [4] all payments of money to either, *made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter,* or with a view to the preference of one creditor to another ... *shall be utterly null and void.*

12 U.S.C. § 91 (emphasis and numeration added). Branch claims that CBT's and MNB's January 4, 1991 transfers of federal funds to BNE (made at a time when BNE was deeply insolvent) in sufficient quantity to render CBT and MNB insolvent if the Regulators decided to close BNE (which CBT and MNB allegedly knew was imminent), constituted voidable transfers made to prevent lawful distribution of CBT's and MNB's assets to BNEC. Branch therefore seeks a judgment requiring FDIC–BNE as the initial transferee, and FDIC–New BNE and Fleet–Mass as subsequent transferees, to return to FDIC–CBT and FDIC–MNB the full amount of those sales.[24] The defendants have moved to dismiss Branch's claims on four grounds, challenging Branch's satisfaction of virtually every clause of section 91. The Court addresses each of the defendants' arguments in turn.

 The defendants first argue that section 91 applies only to transfers, deposits and payments made from a bank to its shareholders or creditors. Thus, since BNE is neither a shareholder nor creditor of CBT or MNB,

---

**24.** The Court does not construe Branch's derivative NBA claims to be asserted against FDIC–Corporate. These claims specifically state that recovery is sought only "from [FDIC–BNE] and subsequent transferees," *e.g.,* Mass.Compl. ¶¶ 43, and Branch alleges no theory under the NBA akin to that provided in the Bankruptcy Code, *see* 11 U.S.C. § 550(a)(1) (allowing recovery for "entity for whose benefit" fraudulent transfers were made), which would purport to allow recovery from FDIC–Corporate.

the defendants contend that section 91 is inapplicable to federal funds transfers from CBT and MNB to BNE. The defendants misread section 91. By its express terms, section 91 applies to four separate categories of transfers (as numbered above), the first of which expressly includes "transfers of . . . deposits to [any national banking association's] credit," without any requirement that such transfers be made to the bank's shareholders or creditors (unlike the third and fourth categories, upon whose language the defendants rely). See, e.g., MCorp v. Clarke, 755 F.Supp. 1402, 1405, 1419–20 (N.D.Tex. 1991) (applying section 91 to a transfer of federal funds between two affiliated banks, but holding that the transaction was made in the ordinary course of business). One of the NBA's essential purposes, which is "to bolster public confidence in the banking system" by preventing a bank from dissipating its assets on the eve of failure, see Federal Deposit Ins. Corp. v. Goldberg, 906 F.2d 1087, 1093 (5th Cir.1990), would surely be thwarted if section 91 prevented a bank from giving away its assets to its creditors, but allowed the bank to give away those same assets to its affiliates. The Court rules that the federal funds transfers are of a type encompassed by section 91.

■ The defendants next contend that Branch has failed to allege that the challenged transfers were made "in contemplation of [insolvency]." 12 U.S.C. § 91. Specifically, the defendants claim that Branch insufficiently alleges that the officers of CBT and MNB believed, or had reason to believe, that the challenged transfers would render CBT and MNB insolvent on a liquidity (unable to meet depositor and creditor claims), as opposed to a book (liabilities in excess of assets) basis. The FDIC contends that only in the former case may an action be asserted under section 91. This reading of section 91 is too narrow and technical. As recently summarized by the Fifth Circuit:

A bank is in contemplation of insolvency when the fact becomes readily apparent to its officers that the concern will presently be unable to meet its obligations, and will be obliged to suspend its ordinary operations. In other words, if [the officers of

the bank] knew, or ought to have known, that at the time of the transfers the suspension of the regular business of the bank was imminent, the transfers were made in contemplation of insolvency.

Goldberg, 906 F.2d at 1091 (citations, emphasis and quotations omitted) (insertion in original). In Goldberg, the court found this requirement met because the bank directors knew, or should have known, due to close contact with OCC representatives and an earlier attempt by the OCC to close the bank which resulted in a run on the bank, that "closure of the bank [by the OCC] was imminent." Id. at 1091–92.

Here, Branch alleges that the federal funds transfers occurred on January 4, 1991, the day after BNEC and BNE reported such huge quarterly losses that newspapers reported BNEC's banking operations were in peril, and during an ongoing depositor run on both BNE and CBT. CBT's and MNB's officers and directors surely must have known that, if BNE were closed, not only would the federal funds sales not be repaid, but CBT and MNB would most likely be subject to a cross-guarantee assessment for millions of dollars under 12 U.S.C. § 1815(e) (as MNB was on January 6, 1991). Under these alleged circumstances, Branch sufficiently alleges that CBT and MNB knew, or should have known, that CBT's and MNB's closure was imminent on the date of the transfers. Accordingly, the Court rules that Branch successfully alleges that the transfers were made in contemplation of insolvency.

■ The defendants' third argument is that Branch fails to show that the transfers were "made with a view to prevent the application of [CBT's or MNB's] assets in the manner prescribed by [the NBA], or with a view to the preference of one creditor to another." 12 U.S.C. § 91. Branch meets both parts of this test. Section 194 of the NBA requires FDIC–CBT and FDIC–MNB to provide a ratable distribution of receivership assets to CBT's and MNB's creditors, and then to distribute any remaining assets to the shareholders. 12 U.S.C. § 194; see also 12 U.S.C. § 1821(d)(11)(B). Here, Branch alleges that the federal funds were transferred to BNE for the express purpose

of benefitting the FDIC as insurer of BNE's depositors, when otherwise they would have been available to satisfy the claims of CBT's and MNB's creditors and shareholders. Thus, Branch alleges that the transfers were made "with a view to prevent the application of [CBT's and MNB's assets] in the manner prescribed by [section 194], or with a view to the preference of [BNE's creditors] to [CBT's and MNB's creditors]."

█ Finally, the defendants claim that the federal funds transfers were made in the "ordinary course of business," and hence that section 91 is inapplicable.[25] *See Aycock v. Bradbury*, 77 F.2d 14, 17 (10th Cir.1935) ("[t]ransactions taking place in the ordinary course of business ... cannot be assailed in a suit brought under [section 91]"), *cert. denied*, 296 U.S. 589, 56 S.Ct. 101, 80 L.Ed. 416 (1935). The term "ordinary course of business" in its application of banking generally means "receiving deposits, paying withdrawals, making loans, and discounting commercial paper," *id.*, but at least one court has held a transfer of federal funds between bank affiliates to be have been made "in the ordinary course of business." *See MCorp v. Clarke*, 755 F.Supp. 1402, 1405, 1419–20 (N.D.Tex.1991). Here, however, the challenged transfers were made during an active run on the deposits of BNE and CBT, amidst allegedly widespread preferential activity by the Regulators in control of BNEC and its Subsidiary Banks. Under these circumstances, the January 4, 1991 federal funds transfers were by no means ordinary.

For the reasons discussed above, the Court rules that Branch states a valid cause of action under 12 U.S.C. § 91 to recover the federal funds transfers on behalf of CBT and MNB.

**25.** Branch claims that since section 91 includes no express requirement that offending transfers must be outside the ordinary course of business, the defendants must plead and prove the point as an affirmative defense. Because the Court rules that Branch meets his burden in any event, the Court need not address this issue.

**26.** Since Branch's unjust enrichment counts explicitly refer to only FDIC–Corporate by name, the defendants contend (although Branch argues otherwise) that these counts apply only to FDIC–

## D. UNJUST ENRICHMENT CLAIMS

In Count X of the Mass. and Bridge Bank Complaints and Count II of the Ct. and Me. Complaints, Branch alleges that FDIC–Corporate improperly directed BNEC's officers and directors to breach their fiduciary duties to BNEC and its shareholders and creditors to its own benefit, and thereby seeks imposition of constructive trusts or equitable liens to remedy unjust enrichment. Branch seeks recovery from all defendants on this theory. FDIC–Corporate contends that Branch fails to state a cause of action.[26]

█ It is well established under Massachusetts law that there is jurisdiction in equity to prevent, by means of the remedial device of a constructive trust, unjust enrichment arising out of a breach of a fiduciary relation. *Warsofsky v. Sherman*, 326 Mass. 290, 293, 93 N.E.2d 612 (1950); *Barche v. Shea*, 335 Mass. 367, 371, 140 N.E.2d 305 (1957); *Barry v. Covich*, 332 Mass. 338, 342–43, 124 N.E.2d 921 (1955). As stated by the Massachusetts Supreme Judicial Court, "[w]hen property has been acquired in circumstances that the holder of the legal title may not in good conscience obtain the beneficial interest, equity converts him into a trustee." *Broomfield v. Kosow*, 349 Mass. 749, 758, 212 N.E.2d 556 (1965); (quoting Judge Cardozo in *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 386, 122 N.E. 378 [1919] ). In addition, while there is no direct Massachusetts authority, the general rule is that an action for restitution may be maintained not only against the fiduciary, but against any third party who colludes with the fiduciary or knowingly obtains a benefit from the breach. *Village of Wheeling v. Stavros*, 89 Ill.App.3d 450, 44 Ill.Dec. 701, 704, 411 N.E.2d 1067, 1070 (1980); *Restatement of Restitution* § 138(2). Accordingly, the Court

Corporate. The Court interprets these counts as potentially encompassing all defendants since the assets were in fact transferred to the Subsidiary Banks themselves, and then to FDIC–Receiver and Fleet. Due to this misunderstanding, the defendants moved to dismiss these claims only with respect to FDIC–Corporate. Accordingly, the Court expresses no opinion as to whether these common law claims state a valid cause of action against other defendants.

rules that Branch adequately states a cause of action against FDIC–Corporate under Massachusetts law for the imposition of an equitable lien or constructive trust to remedy unjust enrichment.

### E. REPAYMENT OF DEBT CLAIMS

Count XI of the Mass. Complaint and Count III of the Ct. Complaint seek repayment of principal and certain interest on debts owed by BNE and CBT to BNEC. Branch asserts these claims against FDIC–BNE and FDIC–CBT, respectively.[27] The defendants do not appear to present any substantive challenges to the adequacy of the statement of these claims.

### F. UNNUMBERED COUNTS

In unnumbered counts at the end of each Complaint, Branch attempts to define the extent to which the FDIC, in both its receivership and corporate capacities, is liable on Branch's substantive claims. In his "Deficiency Claim," Branch alleges that the FDIC improperly omitted from the Purchase and Assumption Agreements Branch's claims against the Subsidiary Banks, and thus contends that FDIC–Corporate is liable under sections 91 and 194 of the NBA, 12 U.S.C. §§ 91, 194, for any resulting deficiency in receivership funds available to pay Branch's claims against FDIC–Receiver. Second, in his "Priority Claim," Branch contends that FDIC–Receiver must pay his claims based upon void or voidable transactions at 100% (with interest), rather than at a reduced or "pro rata" percentage.

The FDIC denies that its liability goes so far. Specifically, FDIC–Receiver contends that under 12 U.S.C. § 194, Branch's claims are under no circumstances entitled to more than a pro rata distribution from receivership assets. In addition, FDIC–Corporate argues that Branch insufficiently alleges circumstances which would warrant FDIC–Corporate to be liable as a guarantor for FDIC–Receiver. Finally, the FDIC claims that section 1821(i) of the FDIA, as enacted in 1989

by FIRREA, conclusively establishes that Branch is entitled to no more than a pro rata distribution from FDIC–Receiver alone.

### 1. Deficiency Claim

At issue here is whether FDIC–Corporate, by allegedly structuring the purchase and assumption transactions so that BNEC would receive less than the liquidation value of its claims, violated sections 91 and 194 of the NBA. Also at issue is whether section 1821(i) of the FDIA bars these claims. The court first addresses the FDIC's obligations under the NBA pre-FIRREA, and then discusses the impact of section 1821(i).

■■■ Section 194 of the NBA provides that "the [FDIC] shall make a ratable dividend ... on all such claims as may have been proved to [its] satisfaction or adjudicated in a court of competent jurisdiction." 12 U.S.C. § 194; see also 12 U.S.C. § 1821(d)(11)(B). Section 91 of the NBA provides a further proscription against unequal distributions by invalidating transfers made "with a view to prevent the application of assets in the manner prescribed by [the NBA]." 12 U.S.C. § 91. Although sections 91 and 194 of the NBA are not expressly made applicable to the FDIC, section 1821(c)(2)(A)(ii) of the FDIA requires that the FDIC be appointed receiver "whenever a receiver is appointed for the purpose of liquidation of winding up" an insured national bank. 12 U.S.C. § 1821(c)(2)(A)(ii). Thus, whenever the FDIC has acted as receiver and liquidated a failed national bank, it has traditionally acted subject to the requirements of sections 91 and 194 of the NBA. Texas American Bancshares, Inc. (TAB) v. Clarke, 954 F.2d 329, 334–35 (5th Cir.1992).

Prior to the enactment of FIRREA in 1989, courts interpreted sections 91 and 194 of the NBA to require the FDIC, if it arranged for the purchase and assumption of some creditors' claims at 100%, to pay off all

---

**27.** The Court does not construe Branch's Complaints to assert these claims against any other defendants. As discussed below, see "Transfers

Free and Clear" discussion *infra*, Branch posits no contractual or legal basis for subsequent

creditors' claims at 100%.[28] *See, e.g., First Empire Bank v. Federal Deposit Ins. Corp.,* 572 F.2d 1361 (9th Cir.1978), *cert. denied,* 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978); *FDIC v. Texarkana Nat'l Bank,* 874 F.2d 264, 270 (5th Cir.1989), *cert. denied,* 493 U.S. 1043, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990). In *First Empire,* for example, the pioneer case in this area, the FDIC, acting as receiver for the United States National Bank of San Diego (USNB), entered into a purchase and assumption agreement with Crocker National Bank (Crocker) for most of the assets and liabilities of USNB. Certain assets and liabilities of USNB's controlling shareholder, however, were not assumed by Crocker. To facilitate the purchase and assumption, the FDIC in its corporate capacity lent to the FDIC as receiver the sum of $128,780,000, which amount was transferred to Crocker under the purchase and assumption agreement. To secure this loan the FDIC in its corporate capacity received a first lien, superior to the unassumed creditors of the receivership, on the unpurchased assets remaining in the receivership. *First Empire,* 572 F.2d at 1365–66. The net effect of this transaction was that, while assumed creditors received 100% payment on their claims, unassumed creditors, subordinated to the FDIC's lien on the remaining receivership assets, were left "without any recovery whatsoever." *Id.* at 1371. Unhappy with the disparate treatment, the unassumed creditors sued the FDIC for payment in full. Ruling in favor of the unassumed creditors, the Ninth Circuit held that a purchase and assumption agreement which provides 100% payment to assumed creditors but lesser payment to unassumed creditors violates sections 91 and 194 of the NBA. The court concluded that in such circumstances, FDIC–Corporate must "stand ready to make the distribution ratable—to supplement the remaining assets should they fall short and to surrender its lien when necessary." *Id.* at 1371.

*First Empire* was later reaffirmed by the Ninth Circuit, as well as by other courts considering the issue. *See, e.g., Federal Deposit Ins. Corp. v. Texarkana Nat'l Bank,* 874 F.2d at 270; *Woodbridge Plaza v. Bank of Irvine,* 815 F.2d 538, 544 (9th Cir.1987) (applying *First Empire* to analogous state law); *Federal Deposit Ins. Corp. v. United States Nat'l Bank,* 685 F.2d 270, 273–77 (9th Cir.1982) (defrauded subordinated noteholder was entitled to receive a ratable distribution from assets transferred in a purchase and assumption transaction); *MCorp v. Clarke,* 755 F.Supp. 1402, 1422–23 (N.D.Tex.1991); *MBank New Braunfels, N.A. v. FDIC,* 721 F.Supp. 120, 123–124 (N.D.Tex.1989). Thus, prior to the passage of FIRREA in 1989, courts had consistently followed the lead of *First Empire* and found that the NBA prevents the FDIC from structuring a purchase and assumption transaction so that some creditors receive one hundred percent while others receive only the liquidation value of their claims or some lesser amount.

Section 1821(i),[29] added by FIRREA in 1989, limits the FDIC's maximum liability under section 194 to any person having a claim against the receiver or the failed bank to the amount that claimant would have re-

---

transferee or other third-party liability on these claims.

**28.** As enacted, the NBA contemplated only liquidations, and thus it was the courts' task " 'to determine the underlying rule laid forth in the Act, and then apply it to the modern-day [purchase and assumption] transaction.' " *Senior Unsecured Creditors' Comm. v. FDIC,* 749 F.Supp. 758, 776 n. 27 (N.D.Tex.1990) (citation omitted) (insertion in original).

**29.** 12 U.S.C. § 1821(i) provides in pertinent part:

(1) *In general*

Notwithstanding any other provision of Federal law or the law of any State and regardless of the method which the [FDIC] determines to utilize with respect to an insured institution in default or in danger of default, including [purchase and assumption and FDIC assistance transactions], this subsection shall govern the rights of the creditors (other than insured depositors) of such institution.

(2) *Maximum liability*

The maximum liability of the [FDIC], acting as receiver or in any other capacity, to any person having a claim against the receiver or the insured depository institution for which such receiver is appointed shall equal the amount such claimant would have received if the [FDIC] had liquidated the assets and liabilities of such institution without exercising the [FDIC's] authority under subsection (n) or this section or section 1823 of this title.

ceived had the FDIC simply liquidated the assets and liabilities of the bank. 12 U.S.C. § 1821(i)(2). Thus, under section 1821(i)(2), even if some creditors receive 100% payment on their claims under a purchase · and assumption due to FDIC assistance, other creditors remain entitled only to the amount they would have received had the bank been liquidated, and are thus not entitled to a pro rata distribution from amounts donated by the FDIC. *TAB*, 954 F.2d at 335, 339, 340; [30] *Senior Unsecured Creditors' Committee v. Federal Deposit Ins. Corp.*, 749 F.Supp. 758, 773 (N.D.Tex.1990). Thus, to the extent that *First Empire* and its progeny required full payment to unassumed creditors *above the liquidation value of their claims,* those cases were effectively overruled on that point by section 1821(i)(2). *Senior Unsecured Creditors,* 749 F.Supp. at 773 ("[w]ith enactment of section 1821(i)(2), Congress ... effectively overruled prior inconsistent judicial decisions. *See, e.g., ... Woodbridge Plaza, ... First Empire, ....*").

 Section 1821(i)(2) does not, however, entirely relieve the FDIC from its duty under section 194 to provide a ratable distribution to unassumed creditors.[31] *See Pittsburgh & Lake Erie R. Co. v. Railway Executives Ass'n,* 491 U.S. 490, 510, 109 S.Ct. 2584, 2596, 105 L.Ed.2d 415 (1989) ("when two [federal] statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective ... if we can do so while preserving their sense and purpose."); *Natural Resources Defense*

*Council v. Environmental Protection Agency,* 824 F.2d 1258, 1279 (1st Cir.1987). As is clear from its plain language as well as its legislative history, section 1821(i)(2) must be read simply to limit, rather than eliminate, the FDIC's obligations under a purchase and assumption agreement, thus requiring a ratable distribution only of the value of the failed bank's assets as if it had been liquidated. *See* 12 U.S.C. § 1821(i)(1), (2); H.R.Conf. Rep. No. 222, 101st Cong., 1st Sess. 397 (1989) ("[c]urrent law is clarified with respect to FDIC's liability in the event it elects to arrange an assisted acquisition or [purchase and assumption]. In such event the FDIC as receiver or in any other capacity is liable to a claimant only for the amount that the claimant would realize from the liquidation [of the bank]"), *reprinted in* 1989 U.S.C.C.A.N. 432, 436; 135 Cong.Rec. H4972–02, H4975 (daily ed. August 3, 1989) ("[Section 1821(i) ] embodies the very simple and straightforward principle that creditors of an insolvent institution are entitled to only their pro rata share of the value of a failed institution's assets") (emphasis added); *see also TAB,* 954 F.2d at 340; *Senior Unsecured Creditors',* 749 F.Supp. at 773. Thus, while section 1821(i)(2) relieves the FDIC of its former obligation to provide a ratable distribution to unassumed creditors over and above the liquidation value of their claims, thereby allowing the FDIC to inject its own funds into purchases and assumptions without incurring equivalent obligations to unassumed creditors, *see TAB,* 954 F.2d at 335, 340, it does not relieve the FDIC of its duty under sections 91 and 194 of the NBA to provide a

---

**30.** The *TAB* court actually interpreted section 194 itself to require ratable distribution only to the extent of receivership assets (and thus not to the extent of FDIC assistance), 954 F.2d at 335 (the court declined to apply section 1821[i] retroactively), but noted that its holding "is consistent with the result that would be reached on these facts under FIRREA; the FDIC is not compelled to pay a creditor more than the pro rata share it would have received if the FDIC had liquidated the bank." *Id.* at 340.

**31.** In *Vinton v. Trustbank Sav., F.S.B.,* 798 F.Supp. 1055, 1058 (D.Del.1992), the District Court for the District of Delaware states that "the former ratable distribution requirement of the [NBA], which formerly applied to the Federal Deposit Insurance Corporation[,] ... was eliminated by [section 1821(i) of FIRREA].... [T]he

passage of FIRREA Section 1821(i) effectively overruled the 'ratable distribution' requirement of the NBA." As should be clear from the accompanying text, this Court respectfully disagrees with the *Vinton* court's strong language and believes the *Vinton* court overspoke. Here, the FDIC itself concedes that "[even after enactment of section 1821(i) ] distributions from the BNE[ ] estate are governed by section 194 of the NBA," Defs.' Cons.Reply at 15–16; Def.'s Post-Hearing Br. at 15–16; Defs.' Cons.Reply at 39 n. 55 ("the parties agree—the NBA requires a ratable distribution to creditors of a failed bank up to the value of the failed bank's assets upon liquidation"), and merely disputes whether FDIC-Corporate itself may be held liable to ensure a pro rata distribution to unassumed creditors.

ratable distribution to unassumed creditors up to the liquidation value of their claims. Accordingly, even after section 1821(i), unassumed creditors may still maintain an action against FDIC–Corporate under sections 91 and 194 of the NBA to ensure a ratable distribution up to liquidation value.

■ Here, Branch alleges that the FDIC transferred *virtually all* of the assets of the Subsidiary Banks to the Bridge and Fleet Banks through the Purchase and Assumption Agreements, yet omitted from these Agreements the liabilities of the Subsidiary Banks to BNEC and its subsidiaries. Due to the extent of Branch's claims, which are in excess of two billion dollars, Branch thus clearly alleges that receivership assets will be insufficient to pay his claims against FDIC–Receiver. Accordingly, Branch establishes the necessary elements for a viable claim under sections 91 and 194 of the NBA.

FDIC–Corporate, nonetheless, contends that because the receivership claims processes have yet to be completed, and thus the existence or extent of a deficiency in receivership funds has yet to be determined, Branch's deficiency Claims are premature.

■ The issue of ripeness turns on both "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Development Com'n,* 461 U.S. 190, 201, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983). A Court must determine whether a plaintiff's claim "involves uncertain or contingent events that may not occur as anticipated, or indeed may not occur at all." *Lincoln House, Inc. v. Dupre,* 903 F.2d 845, 847 (1st Cir.1990). Where the essential facts establishing a right to relief have already occurred, an issue is fit for judicial review. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967).

■ Here, all of the salient events have either already occurred or have been sufficiently alleged. *See, e.g., Woodbridge Plaza,* 815 F.2d at 542 (claim against FDIC–Corporate to cover a deficiency in receivership funds was ripe even though the validity and amount of plaintiff's underlying claim against FDIC–Receiver had not yet been established).[32] In addition, Branch has an interest in resolving all of the claims arising out of the same factual circumstances in the same proceeding. Here, FDIC–Corporate would remain a defendant on several other counts even in the absence of Branch's deficiency Claim. Thus, it would be inappropriate to bifurcate and potentially further complicate these proceedings by forcing Branch to pursue FDIC–Corporate in yet another lawsuit after the conclusion of this litigation. *Cf. Morse/Diesel, Inc. v. Fidelity and Deposit Co. of Md.,* 715 F.Supp. 578, 583 (S.D.N.Y. 1989).

Accordingly, the Court rules that Branch presents a ripe and viable claim against FDIC–Corporate under sections 91 and 194 of the NBA to ensure a pro rata distribution from receivership funds up to the liquidation value of his unassumed claims.

*2. Priority Claim*

At issue in Branch's Priority Claim is whether Branch's substantive claims, to the extent that they are based upon void or voidable transactions (allegedly all claims except Branch's repayment of debt claims),[33]

---

**32.** Although in *Woodbridge* the FDIC conceded that virtually no assets remained in the receivership to pay the plaintiff's claims, 815 F.2d at 540, Branch has sufficiently alleged that such a deficiency exists in this case. The Court also notes, consistent with the discussion immediately above, that although *Woodbridge* and other *First Empire* progeny have been partially overruled by section 1821(i), they are still good law to the extent they are consistent with that section's liability limitations.

**33.** Branch seeks full recovery on his Bankruptcy Code claims, *see* 12 U.S.C. § 548(a) (the Trustee

"may avoid any transfer"), his derivative NBA claims, *see* 12 U.S.C. § 91 (transactions shall be "utterly null and void"), his derivative FRA claims (these claims have been dismissed *supra* ), and his unjust enrichment claims. *See Restatement of Restitution 2d,* chap. 3 intro. (tent. draft no. 1, 1983) ("[w]hen a claimant may assert [a constructive trust], he is in a position of special advantage over general creditors of the person owing restitution."). Branch concedes that his remaining claims, seeking repayment of certain debts owed by BNE and CBT to BNEC, are not

have priority ahead of the depositors and other general creditors of the Subsidiary and Bridge Bank receiverships so that they must be paid by FDIC–Receiver in full (with interest), rather than at a reduced or pro rata percentage.

Branch argues that while section 1821(i)(2) limits a claimant's maximum recovery under section 194 to the liquidation value of his claims, it does not address the amount a creditor is entitled to in a liquidation, and thus does not alter the pre-existing priorities among creditors of failed banks. Branch contends that under these pre-existing priorities, claims based upon null and void transactions have traditionally been given priority above the claims of other general creditors. Accordingly, Branch argues that, even taking section 1821(i)(2) into account, his claims against FDIC–Receiver based upon void and voidable transactions are to be paid by FDIC–Receiver in full. In response, the FDIC claims that under section 194, all creditors, including those with claims based on "null or void" transactions, are entitled to no more than a pro rata distribution of receivership assets. In addition, the FDIC contends that, to the extent a conflict did exist between the ratability requirement of section 194 and "void and avoidable" transactions, section 1821(i)(2) resolved this conflict in favor of ratable distribution.

■ Through the NBA, Congress sought to achieve "a just and equal distribution of the assets of national banks among all unsecured creditors." *Davis v. Elmira Sav. Bank,* 161 U.S. 275, 284, 16 S.Ct. 502, 504, 40 L.Ed. 700 ( [1896] ). "Dividends are to be paid to all creditors ratably; that is to say, proportionally. To be proportionate they must be made by some uniform rule. . . . All creditors are to be treated alike." *U.S. ex rel. White v. Knox,* 111 U.S. 784, 786, 4 S.Ct. 686, 686–87, 28 L.Ed. 603 (1884). Thus, claimants seeking to avoid pro rata distribu-

tion of assets face a heavy burden of proof. *Downriver Com. Fed. Credit. U. v. Penn Square Bank,* 879 F.2d 754, 761–62 (10th Cir.1989), *cert. denied,* 493 U.S. 1070, 110 S.Ct. 1112, 107 L.Ed.2d 1019 (1990); *Atlantic Gypsum Co. v. Federal Nat. Bank of Boston,* 76 F.2d 59, 61 (1st Cir.1935); *In re NBW Commercial Paper Litigation (NBW),* 1992 WL 73135, *22 (D.D.C.1992).

■ Although the Court is aware of no case which has addressed whether statutorily "null and void" transactions are entitled to priority treatment from a bank receivership, the Court derives guidance from cases addressing analogous claims for rescission or imposition of a constructive trust under a fraud theory. *See, e.g., Downriver,* 879 F.2d at 762–764 (citing numerous cases); *Bruneau v. Federal Deposit Ins. Corp.,* 785 F.Supp. 585, 587–88 (E.D.La.1992), *aff'd,* 981 F.2d 175 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2413, 124 L.Ed.2d 636 (1993); *NBW,* 1992 WL 73135, *22. In these cases, the plaintiffs sought full recovery of their deposits on the theory that, because of fraud on behalf of the bank, "there really [was] no deposit, and [thus] the money is held in a constructive trust." *Bruneau,* 785 F.Supp. at 588; *Downriver,* 879 F.2d at 762–63. Thus, although the basis for rescission was common law fraud rather than statutory mandate, the plaintiffs in these cases also sought full recovery on the theory that void or avoidable transactions are entitled to priority treatment. These cases are thus directly relevant to whether Branch's unjust enrichment claims might be entitled to full recovery.[34]

At a minimum, recent cases in this area stand for the proposition that, even where a transaction is avoidable, full restitution is denied where it would result in inequitable treatment to similarly situated depositors, or would disrupt orderly administration of the receiver's estate. *See, e.g., Downriver,* 879

entitled to 100% recovery. *See* Pl.'s Post–Hearing Br. at 9.

**34.** The Court notes that although the term "constructive trust" is used to describe both the remedy for Branch's unjust enrichment claims as well as the vehicle through which full recovery may be obtained from a bank receivership, the Court

views these as separate issues. In the Court's view, Branch would not necessarily be entitled to more than a pro rata distribution on his unjust enrichment claims. As with Branch's other substantive (allegedly void or voidable) claims, it is Branch's Priority Claim which seeks to ensure full recovery on that claim.

F.2d at 762–63 (because "financial institutions other than the plaintiffs undoubtedly placed similar trust in [the bank's] misrepresent[ations] ... the National Bank Act precludes these depositors from being treated differently"); *see also Bryant v. Linn County, Or.,* 27 F.Supp. 562, 563, 565–66 (D.Or. 1938) (all depositors shared the plaintiff's situation since bank had been "hopelessly insolvent" for "many years"); *Poole v. Elliott,* 76 F.2d 772, 774–75 (4th Cir.1935) (claim "would affect a large part of the obligations to depositors"). One court has even rejected the "concept" of imposing a constructive trust on receivership assets, holding that "such a recovery [implicitly] violates both of the federal policies (equality among creditors and orderly liquidation of estate) implicit in the National Bank Act." *Bruneau,* 785 F.Supp. at 588 (also suggesting in dicta that section 1821[i] of the FDIA mandates such a result), *aff'd,* 981 F.2d at 178. Thus, under the principles of these cases, it is clear that Branch faces at best an onerous burden to show that allowing him full recovery neither would treat similarly situated creditors inequitably, nor would disrupt orderly administration of the receivership estates. It is unlikely, based upon the allegations and apparently undisputed circumstances of this case, that Branch will be able to make such a showing.

Nevertheless, in view of the offsetting preference against allowance of a motion to dismiss, as well as the unsettled nature of the law in this area, the Court is not disposed to dismiss Branch's request for full recovery at this point in the litigation. *See NBW,* 1992 WL 73135, *2, *22 (denying FDIC's motion to strike plaintiff's request for rescission of commercial paper purchases and hence 100% recovery against FDIC–Receiver in view of heavy burden against a motion to strike and in absence of "a clear rule of law[:] ... [e]ven the FDIC's citation of § 1821[i][2] ... does not appear determinative of the issue.") First, the Court does not interpret the existing case law conclusively to preclude full recovery, *see Downriver,* 879 F.2d at 762–64 (denying particular claim but defining circumstances where full recovery would be warranted), *NBW,* 1992 WL 73135 at *22, and particularly not with respect to Branch's federal law claims. *Cf. Bruneau,* 785 F.Supp. at 588 (denying full recovery in part because "claims against the receiver's estate [a]re governed by federal law"). Second, while section 1821(i)(2) of the FDIA limits the FDIC's maximum liability to liquidation value (as discussed *supra* ), the Court sees no clear evidence, either in the language of the statute or in its legislative history, that section 1821(i)(2) alters or defines the priorities which define "liquidation value." [35] Therefore, this Court agrees with the *NBW* court that section 1821(i) does not conclusively resolve the issue.

Accordingly, although the Court seriously doubts that Branch will be able to overcome the heavy presumption in favor of pro rata distribution with respect to any of his claims, the FDIC's motion to dismiss Branch's Priority Claim is denied.[36]

---

**35.** In suggesting that section 1821(i) mandates a pro rata distribution on all claims, the *Bruneau* court relied upon a legislative excerpt to the effect that "[section 1821(i)] embodies the very simple and straightforward principle that creditors of an insolvent institution are entitled *to only their pro rata share of the value of a failed institution's assets.*" 135 Cong.Rec. H4972-02, H4975 (daily ed. August 3, 1989) (emphasis added). As explained at length above, *see* Deficiency Claim discussion *supra,* this excerpt most clearly references the fact that section 1821(i)(2) simply relieves the FDIC of its previous duty ratably to distribute donations from the insurance fund. Thus, at most, this excerpt provides only a vague and sideways suggestion that section 1821(i) alters preexisting liquidation priorities. *Cf.* H.R.Conf.Rep. No. 222, 101st Cong., 1st Sess. 397 (1989) (regarding section 1821(i): "[c]urrent law is clarified with respect to FDIC's liability in

the event it elects to arrange an assisted acquisition or [purchase and assumption]. In such event the FDIC as receiver or in any other capacity is liable to a claimant only for the amount that the claimant would realize from the liquidation [of the bank]"), *reprinted in* 1989 U.S.C.C.A.N. 432, 436.

**36.** The court expresses no opinion as to Branch's contentions regarding the potential interplay of his Priority and Deficiency Claims (ie., whether, if Branch succeeds on both with regard to an underlying claim, FDIC–Corporate may be held liable to ensure *full* payment of that underlying claim). The Court notes, however, that Branch appears to attempt to have his cake and eat it too. First, under his Priority Claim, Branch contends that his void and voidable claims are *exempt* from the NBA's ratable distribution re-

**418**

## G. GENERAL DEFENSES OF FDIC–CORPORATE

As discussed above, Branch asserts claims against FDIC–Corporate under the fraudulent conveyance provisions of the Bankruptcy Code, under the FRA (these claims have been dismissed *supra*), under the common law to remedy unjust enrichment, and under sections 91 and 194 of the NBA to ensure a pro rata distribution of receivership funds (Deficiency Claim). In response, FDIC–Corporate contends (i) that Branch lacks standing to assert these claims; and (ii) that Branch's Bankruptcy Code and unjust enrichment claims are barred for failure to comply with the administrative requirements of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*[37]

### 1. Standing

In essence, the question of standing is whether the plaintiff is the proper party to have the court decide the merits of the dispute or of particular issues. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1974). In order to establish standing, a plaintiff must "show an injury to himself that is likely to be redressed by a favorable decision," so as to have " 'a [sufficient] personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917,

1924, 48 L.Ed.2d 450 (1976); *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 74, 98 S.Ct. 2620, 2631, 57 L.Ed.2d 595 (1978).

Here, Branch's Bankruptcy Code claims against FDIC–Corporate are founded directly upon section 550(a)(1), which specifically provides a trustee in bankruptcy a cause of action against the "entity for whose benefit [a fraudulent] transfer was made." 11 U.S.C. § 550(a)(1). Similarly, Branch's Deficiency Claim is brought directly under sections 91 and 194 of the NBA, which allow a banking holding company standing to sue FDIC–Corporate to ensure a pro rata distribution. 12 U.S.C. § 91, 194; *e.g., TAB*, 954 F.2d 329. Finally, Branch's unjust enrichment claim alleges that FDIC–Corporate, through its control over BNEC's directors and officers, improperly engineered the challenged transfers to the detriment of BNEC and its shareholders and creditors. Under each claim, it is quite clear that Branch, representing BNEC and its shareholders and creditors, is precisely the proper plaintiff to bring the action. Moreover, Branch has shown injury that clearly could be redressed by decisions in his favor.[38] Accordingly, Branch has standing to pursue his claims against FDIC–Corporate.

### 2. Federal Tort Claims Act

While it is axiomatic that the United States is immune from suit unless it consents

---

quirement, and hence contends that they must be paid in full by FDIC–Receiver. Then, under his Deficiency Claim, Branch argues that *FDIC–Corporate* must ensure payment of these same claims also in full, *because* of the NBA's ratable distribution requirement. The Court will jump this hurdle when and if it comes, but questions whether section 194 could be interpreted to allow such a result.

37. The Court of course recognizes the fundamental maxim that matters of jurisdiction must be resolved before matters of substance, *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), and places these jurisdictional matters out of order only for organizational purposes.

38. The Court is puzzled by FDIC–Corporate's citation to *Allen v. Wright*, 468 U.S. 737, 757–58, 104 S.Ct. 3315, 3327–28, 82 L.Ed.2d 556 (1984), and related cases for the proposition that Branch's injuries must be "fairly traceable" to

FDIC–Corporate's alleged unlawful conduct. As a preliminary matter, Branch's Complaints are replete with such allegations. More relevant, however, is the Supreme Court's observation that "[g]eneralizations about standing ... are largely worthless as such." *Association of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). In *Allen* and related cases, the plaintiffs' injuries were based on the actions of third parties, and thus the plaintiffs were required to show that their injuries were "fairly traceable" to the defendant government officials' alleged unlawful conduct in order to ensure that an injunction against the officials would affect the third parties' behavior sufficiently to afford redress to plaintiffs. *E.g., Allen*, 468 U.S. at 758–59, 104 S.Ct. at 3328–29. These cases thus have little application here since Branch is seeking direct monetary redress.

to be sued, *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769–70, 85 L.Ed. 1058 (1941), Congress has explicitly waived sovereign immunity for FDIC–Corporate, and has provided FDIC–Corporate with the capacity "to sue and be sued, and complain and defend, in any court of law or equity." 12 U.S.C. § 1819(a). Title 28 U.S.C. section 2679(a) restricts this waiver for certain claims, however, providing that claims governed by the Federal Tort Claims Act (FTCA) must be brought pursuant to the FTCA's procedural requirements. *Santoni v. Federal Deposit Ins. Corp.,* 508 F.Supp. 1012, 1014 (D.P.R.1981), *aff'd,* 677 F.2d 174 (1st Cir.1982). Thus, despite the general waiver of sovereign immunity as to FDIC–Corporate, claims against FDIC–Corporate "for money damages, . . . for injury or loss of property . . . caused by the negligent or wrongful act or omission of any employee of the Government," 28 U.S.C. § 1346, must be brought against the United States itself rather than against FDIC–Corporate, and must be preceded by the filing of an administrative claim. 28 U.S.C. §§ 1346(b), 2675(a); *Corte-Real v. United States,* 949 F.2d 484, 485 (1st Cir.1991); *Santoni,* 508 F.Supp. at 1014. Since in this case it is undisputed that Branch failed to follow these requirements, FDIC–Corporate contends that two of Branch's claims, his Bankruptcy Code claims and his unjust enrichment claims, are barred for failure to comply with the FTCA's procedural requirements. The Court addresses each challenged claim in turn.

 Regarding Branch's Bankruptcy Code claims, one court has suggested in dicta that fraudulent conveyance claims do not allege "torts" under the FTCA. *See In re Anjopa Paper & Board Mfg. Co.,* 269 F.Supp. 241, 248, 271 (S.D.N.Y.1967) ("FDIC must turn over what is not its right"). After reviewing the nature of fraudulent conveyance claims under the Code, this Court agrees that such claims constitute neither

tort actions nor monetary damages actions within the meaning of section 1346(b).

A trustee suing under the Code seeks to "avoid . . . transfer[s]" so that the trustee "may recover . . . the property transferred or . . . the value of such property." 11 U.S.C. §§ 548, 550; *see also* Mass.Gen.L. ch. 109A § 9(1)(a) (incorporated into Branch's Bankruptcy Code claims via section 544[b] ). Nowhere do these provisions speak in terms of "liability" for a wrongful act or in terms of "money damages." *See id.* As the First Circuit observed with regard to the old Bankruptcy Act:

> The Act carefully speaks of conveyances of property as being "null and void," and authorizes suit by the trustee to "reclaim and recover such property or collect its value." The actions legislated against are not "prohibited"; those persons whose actions are rendered "null and void" are not made "liable"; and terms such as "damages" are not used. The legislative theory is cancellation, not the creation of liability for the consequences of a wrongful act.

*Robinson v. Watts Detective Agency, Inc.,* 685 F.2d 729, 738 (1st Cir.1982) (declining to apply joint tortfeasor theory) (quoting *Elliot v. Glushon,* 390 F.2d 514, 516 [9th Cir.1967] ), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953 (1983); *see also Bowen v. Massachusetts,* 487 U.S. 879, 893, 108 S.Ct. 2722, 2732, 101 L.Ed.2d 749 (1987) ("[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as "money damages").[39]

Moreover, Branch's allegations of actual intent to defraud on the part of the FDIC and BNEC's directors do not convert Branch's fraudulent conveyance claims into actions founded upon a tort. As stated by the court in *Hearn 45 St. Corp. v. Jano,* 283 N.Y. 139, 27 N.E.2d 814 (1940):

---

**39.** The Court notes that recovery from the "entity for whose benefit [a fraudulent] transfer was made" perhaps comes closer to damages recovery than does recovery from an initial or subsequent transferee (entities who actually "received" the assets), but nonetheless rules, in accordance with the accompanying discussion, that such recovery does not constitute money dam-

ages (or a "tort" claim for that matter) under the FTCA. The Court also notes that to treat recovery from initial and subsequent transferees under the Bankruptcy Code as exempt from the FTCA, but recovery from entities who benefitted as governed by the FTCA, would result in ludicrous jurisdictional claim splitting.

Surely the action is not one for actual fraud where a complete cause of action may be stated by a showing of the bare facts of a voluntary conveyance resulting in insolvency. Such a conveyance is but one of the two kinds which are deemed fraudulent by the operation of the statute. Both kinds are simply acts which are voidable at the behest of the creditor as a result of the statutory declaration.... The fraud such as it is, is only incidental to the right of the creditor to follow the assets of the debtor and obtain satisfaction of the debt.... The plaintiff's right is complete without reference to the quality or character of the acts of the individual defendants.

*Id.* at 143 (regarding New York bankruptcy law); *United States v. Niedorf,* 522 F.2d 916, 918 (9th Cir.1975), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976); *United States v. Franklin National Bank,* 376 F.Supp. 378, 381–82 (E.D.N.Y.1973).

It is for just these reasons, for example, that courts have universally applied quasi-contractual or equitable statutes of limitations, rather than tort statutes of limitations, to fraudulent conveyance actions. *E.g., Niedorf,* 522 F.2d at 918; *Desmond v. Moffie,* 375 F.2d 742, 743 (1st Cir.1967) (Massachusetts fraudulent conveyance law); *Franklin Nat'l Bank,* 376 F.Supp. at 381. Similarly, courts have declined to apply tort contribution rules to fraudulent conveyance claims, *e.g., Robinson,* 685 F.2d at 738; *Wieboldt Stores, Inc. v. Schottenstein,* 111 B.R. 162, 169 (N.D.Ill.1990), and have treated fraudulent conveyance actions as claims for equitable relief rather than claims in tort for determining choice of law. *See, e.g., In re Kaiser Steel Corp.,* 87 B.R. 154, 159 (Bankr.D.Colo. 1988); *see also In re O'Day Corp.,* 126 B.R. 370, 390–91 (Bankr.D.Mass.1991); *In re Morse Tool, Inc.,* 108 B.R. 384, 386–88

(Bankr.D.Mass.1989). *But see RCA Corp. v. Tucker,* 696 F.Supp. 845, 847, 853–54 (E.D.N.Y.1988) (applying tort rather than property limitations period).

Accordingly, for the reasons discussed above, the Court rules that Branch's Bankruptcy Code claims are not subject to the exclusivity provisions of the FTCA.[40]

■ Turning to Branch's unjust enrichment claims, Branch alleges that FDIC–Corporate improperly directed BNEC's officers and directors to breach their fiduciary duties to BNEC and its creditors to its own benefit. Although Branch could bring such an action in tort for damages, *e.g., S & K Sales Co. v. Nike, Inc.,* 816 F.2d 843, 848 (2d Cir.1987), Branch asserts this claim in equity to redress unjust enrichment through a constructive trust or equitable lien. *See, e.g., Broomsfield v. Kosow,* 349 Mass. 749, 758, 212 N.E.2d 556 (1965); *Warsofsky v. Sherman,* 326 Mass. 290, 293, 93 N.E.2d 612 (1950); *Restatement of Restitution* § 138, comment a.

For reasons similar to those discussed above with respect to Branch's fraudulent conveyance claims, such restitutionary actions do not constitute "claims ... for money damages" within the purview of section 1346(b). *See, e.g., Corbin v. Federal Reserve Bank of New York,* 458 F.Supp. 143, 146 & n. 4 (S.D.N.Y.1978) (FTCA inapplicable to claim to adjudge FDIC constructive trustee for breach of fiduciary duty in its role as receiver); *Bor–Son Bldg. Corp. v. Heller,* 572 F.2d 174, 178 (8th Cir.1978) (FTCA did not apply to unjust enrichment, constructive trust, and equitable lien claims brought against Secretary of the Department of Housing and Urban Development under analogous "sue and be sued" provision, 12 U.S.C. § 1072); *Fed-*

40. One court has suggested that the federal bankruptcy laws, which grant bankruptcy courts "equitable power ... to grant complete relief between the parties before the court," automatically preempt application of the FTCA. *Anjopa,* 269 F.Supp. at 271. In addition, other courts have noted that where a claim arises exclusively from federal law or where there is no analogy with private conduct, the FTCA is inapplicable. *E.g., Meyer v. Fidelity Sav.,* 944 F.2d 562, 569 (9th Cir.1991) (federal constitutional torts not within FTCA), *cert. denied,* —— U.S. ——, 113 S.Ct.

1578, 123 L.Ed.2d 146 (1993); *Federal Deposit Ins. Corp. v. Citizens Bank & Trust Co.,* 592 F.2d 364, 371 n. 9, 372 & n. 12 (7th Cir.1979) (claims under sections 91 and 194 of NBA not within FTCA); *Woodbridge Plaza,* 815 F.2d at 543 (state law claim for pro rata distribution exempt from FTCA because no analogous state law claim would exist against private person). Since the Court rules that Branch's fraudulent conveyance claims are not governed by the FTCA, the Court need not address the potential application of either of the principles espoused in these cases.

eral Deposit Ins. Corp. v. Walker, 815 F.Supp. 987, 990 (N.D.Tex.1993) (FTCA barred tort claims but not accompanying unjust enrichment claim);[41] cf. Edelman v. Federal Housing Administration, 382 F.2d 594, 597 (2d Cir.1967). Accordingly, as with Branch's Bankruptcy Code claims, the Court rules that Branch's unjust enrichment claims are not governed by the FTCA.[42]

## D. SUBSEQUENT TRANSFEREES: TRANSFERS FREE AND CLEAR

█ Branch seeks recovery from FDIC–Receiver II and Fleet under subsequent transferee theories. Under the Bankruptcy Code, a Trustee is specifically entitled to recover fraudulently transferred assets from any subsequent transferees. See 11 U.S.C. § 550(a)(2), (b) (subject to a good faith defense). Branch asserts a similar right with respect to his derivative claims under section 91 of the NBA. See 12 U.S.C. § 91.[43]

█ FDIC–Receiver II and Fleet disclaim such liability. Under the FDIA, and particularly as amended by FIRREA in 1989, the FDIC is granted broad, discretionary authority to structure purchase and assumption transactions. See 12 U.S.C. §§ 1821(d)(2)(G)(i), (n)(1)(B)(ii), (n)(1)(B)(iii);

Gosnell v. Federal Deposit Ins. Corp., 938 F.2d 372, 376 (2d Cir.1991). The FDIC may transfer assets while retaining corresponding liabilities, see, e.g., Trigo v. Federal Deposit Ins. Corp., 847 F.2d 1499 (11th Cir.1988) (pre-FIRREA case), and may do so "without any approval, assignment, or consent with respect to such transfer." 12 U.S.C. § 1821(d)(2)(G)(i)(II). FDIC–Receiver II and Fleet argue that, pursuant to this authority, the FDIC was entitled to and did transfer to the Bridge Banks and Fleet Banks the Subsidiary Banks' assets free and clear of any corresponding liabilities to BNEC or its affiliates, including the claims now asserted by Branch. In response, Branch contends that the FDIA, while admittedly granting the FDIC broad authority to structure purchase and assumption transactions, does not displace the positive commands of other federal statutes which mandate subsequent transferee recovery. Branch also claims that, in any event, the Bridge Banks and Fleet Banks did in fact assume liability for Branch's claims under the Purchase and Assumption Agreements.[44]

At present, the Court is unable to determine from the Purchase and Assumption Agreements whether the Bridge Banks and Fleet Banks assumed liability for any or all

41. The *Walker* court nonetheless dismissed the plaintiff's unjust enrichment claim on the basis that it was "not aware of any authority ... that would support a waiver of sovereign immunity to allow the assertion of a claim for unjust enrichment." 815 F.Supp. at 990 (acting sua sponte). FDIC–Corporate has not raised this defense, and this Court is aware of no case law (other than *Walker*), which suggests that unjust enrichment claims are not encompassed within FDIC–Corporate's general waiver of sovereign immunity under 12 U.S.C. § 1819(a). Cf. Bor–Son Building Corp., 572 F.2d at 178 (allowing unjust enrichment claim against HUD under analogous "sue and be sued" provision, 12 U.S.C. § 1072); see also Franchise Tax Bd. v. United States Postal Serv., 467 U.S. 512, 517, 104 S.Ct. 2549, 2552–53, 81 L.Ed.2d 446 (1987) ("sue and be sued" waivers are to be "liberally construed").

42. The Court necessarily makes this ruling upon an undeveloped factual record. Accordingly, the Court reserves the question whether certain elements of Branch's unjust enrichment claims may in fact constitute claims for money damages barred by the FTCA. See, e.g., Corbin, 458 F.Supp. at 146 n. 1 (reserving question whether

unjust enrichment claim for interest already paid was claim for money damages).

43. Branch asserts this theory as well with regard to his FRA claims, but the Court has dismissed these claims *supra*. In addition, Branch appears not to seek recovery from FDIC–Receiver II or Fleet on his repayment of debt claims, since he concedes that the Purchase and Assumption Agreements excluded contractual liabilities, (Pl.'s Cons.Opp'n at 59), and posits no alternate theory of subsequent transferee liability on those claims. Finally, since neither party has attempted to address subsequent transferee liability under Branch's unjust enrichment claims (presumably because the defendants interpreted this claim to encompass only FDIC–Corporate), the Court expresses no opinion on that subject.

44. In arguing that the Purchase and Assumption Agreements transferred to the Bridge Banks and Fleet Banks liability for his claims, Branch pleads in the alternative to his allegations underlying his Deficiency Claim, that the Purchase and Assumption Agreements omitted these same claims.

of Branch's claims.[45] The Court thus assumes for the purposes of the present motion, as it must, that the Purchase and Assumption Agreements did in fact transfer to the Bridge and Fleet Banks liability for Branch's claims. Accordingly, the Court need not reach the issue of whether the FDIC's exercise of its authority under the FDIA to omit certain liabilities from a purchase and assumption trumps subsequent transferee liability under the NBA or the Bankruptcy Code. For now, FDIC–Receiver's and Fleet's motion is denied on the basis that, as per Branch's allegations, the Bridge and Fleet Banks assumed liability under the Purchase and Assumption Agreements for Branch's Bankruptcy Code and derivative NBA claims.

## V. CONCLUSION

The defendants' motions to dismiss are granted in part and denied in part. The motions are allowed with respect to counts VII and IX of the Mass. and Bridge Bank Complaints, which are hereby dismissed. In all other respects, in accordance with this Memorandum, the motions to dismiss are denied. To do less, in the face of these detailed allegations, would posit a rule or rules of law having the practical effect of saying to potential creditors of bank holding companies, "Look, you may be repaid in accordance with your contract but, if federal regulators need your money for the good of the national banking system, it's theirs." This the Court is not now willing to do.

Branch should take little solace from this opinion, however. It appears that many of his claims are vulnerable to a well-pleaded motion for summary judgment.

## VI. PROCEDURAL ORDER

Within thirty days of the date of this order, the parties shall submit a joint proposed Case Management Schedule in accordance with Local Rule 16.1 and the standard procedure in this session as explained at the initial Case Management Conference. The joint proposed schedule shall set forth the dates for completion of the significant pre-trial events (not simply time periods based on the happening of other contingencies) and shall include the date when the parties agree the case shall be placed on the Running Trial List.

---

45. Specifically, the Court is unable to determine, simply from the terms used in the Assumption of Liabilities provisions of the Purchase and Assumption Agreements, whether these terms and provisions were intended either to include or exclude liabilities of the types asserted by Branch. *See, e.g.*, Defs.' App.Ex. 5.A. ¶¶ 2.1(b) ("liens or indebtedness affecting ... any assets acquired"), 2.1(e) ("liabilities, if any, for federal funds purchased") 2.1(v) ("any Affiliated Funding").